**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 17-1469

————————

TRACI BERARDELLI; JOSEPH BERARDELLI, on behalf
of their daughter M.B., a minor, and individually on their own
behalf,
                          Appellants

v.

ALLIED SERVICES INSTITUTE OF REHABILITATION
MEDICINE

————————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 3-14-cv-00691)
District Judge:  Hon. Malachy E. Mannion

————————

Argued: November 14, 2017

Before: AMBRO, KRAUSE, and RENDELL, *Circuit Judges.*

(Opinion Filed: August 14, 2018)

Leah S. Batchis
Arleigh P. Helfer, III                [Argued]
Nancy Winkelman
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103

Nicole M. Reimann, Esq.
Batchis Nestle & Reimann
116 Bala Avenue
Bala Cynwyd, PA 19004

    *Counsel for Appellants*

Edwin A. Abrahamsen, Jr.
James J. Conaboy                [Argued]
Abrahamsen Conaboy & Abrahamsen
1006 Pittston Avenue
Scranton, PA 18505

    *Counsel for Appellee*

Amanda L. Nelson
Cozen O'Connor
45 Broadway
16th Floor
New York, NY 10006

    *Counsel for* Amicus Curiae *The Public Interest Law
    Center of Philadelphia*

---

OPINION OF THE COURT

---

KRAUSE, *Circuit Judge*.

For decades, the Rehabilitation Act (RA) and its progeny, the Americans with Disabilities Act (ADA), have served as twin pillars of federal disability discrimination law. Both statutes secure the rights of individuals with disabilities to independence and full inclusion in American society and, unsurprisingly, have been constant companions in our case law as it has developed to effect those rights. The RA assures "meaningful access" to federally funded programs, *Alexander v. Choate*, 469 U.S. 287, 301 (1985), on the one hand, and the ADA provides for "full and equal enjoyment" of public accommodations, 42 U.S.C § 12182(a), on the other, to people with disabilities. When necessary to realize that access and enjoyment, the statutes require "reasonable accommodations," *Choate*, 469 U.S. at 301, or "reasonable modifications," 42 U.S.C. § 12182(b)(2)(A)(ii), to be made by actors within the statutes' reach.

The Department of Justice (DOJ) has promulgated regulations interpreting the ADA's "reasonable modification" requirement to mean that covered actors generally must "modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 36.302(c)(1); *see also id.* § 35.136(a), and must "permit[] [such individuals] to be accompanied by their service animals in all areas of [the covered actor's facilities] where . . . program participants . . . are allowed to go," *id.* § 36.302(c)(7); *see also id.* § 35.136(g). The question presented by this case is one of

3

first impression in the Courts of Appeals: whether, in the absence of a similar regulation specifically interpreting the RA, its mandate of "reasonable accommodations," consistent with the mandate of "reasonable modifications" under the ADA, generally requires that individuals with disabilities be permitted to be accompanied by their service animals and, thus, renders such requested accommodations *per se* reasonable in the ordinary course.

For the reasons set forth below, we hold that it does and that the District Court's contrary jury instructions constitute reversible error. Accordingly, we will vacate the judgment and remand for further proceedings consistent with this opinion.

## I. Factual Background

This case centers on an elementary school student with dyslexia and epilepsy, M.B., and her rebuffed attempts to be accompanied by her service dog to school. When M.B. was a young child, her mother had to monitor her constantly and care for her during epileptic seizures, the onset of which could be subtle or sudden. As M.B. grew older and became more independent, though, her pediatric neurologist recommended that she obtain a service dog to take over this function.[1] M.B.'s

---

[1] People with epilepsy commonly rely on the functional assistance of service dogs to provide care and support and to maintain their independence. Service dogs can be trained to detect and respond to seizures, such as by barking to alert the family when a child has a seizure while playing in another room, and to provide assistance throughout the seizure's duration, such as by lying next to the child to prevent injury. *See* Pub. Interest Law Ctr. Amicus Br. 4.

4

mother therefore arranged to acquire a service dog, which accompanied M.B. to school during second grade and helped her cope with her epilepsy by alerting during a seizure and providing safety and comfort until the seizure had passed.

In third grade, M.B. switched to the dePaul School,[2] which had a specialized program for dyslexic students. Before enrolling M.B. there, M.B.'s mother met with the principal and explained that, in addition to dyslexia, M.B. also had epilepsy and that the service dog, who had recently died, had accompanied M.B. to her previous school. M.B.'s mother also explained that M.B. was on the waiting list for a new service dog that likewise would need to accompany her to school. After receiving assurances from the principal that M.B. was a "very good fit" for the School, M.B.'s mother enrolled her that fall as a third grader. JA 501.

That winter, M.B. came off the waiting list and was paired with a new service dog, Buddy. But when M.B.'s mother asked the principal for permission to send Buddy to school with M.B., the principal refused, asserting for the first time that Buddy would be "too much of a distraction" to other children. JA 673. Because Buddy was not allowed to accompany her, M.B. missed the next two weeks of school to be with Buddy 24 hours a day for an initial intensive bonding period. And after M.B. returned to school, because the principal continued to deny permission for Buddy to accompany her throughout the remainder of third grade, Buddy was not available to alert school staff during seizure activity or

---

[2] Appellee Allied Services Institute of Rehabilitation Medicine operates the dePaul School. We will refer to these entities collectively as "the School."

5

to support her recovery. As a result, M.B.'s mother kept M.B. home when her seizures were more severe.

In an effort to avoid these interruptions to M.B.'s education, M.B.'s mother met with the principal again before fourth grade to request that Buddy be permitted to accompany M.B. in the new school year. By that time, Buddy not only could alert during M.B.'s seizures, but also could predict and alert to them minutes before they even began. But the principal still refused, once more asserting that Buddy might distract other students. Yet again, M.B. attempted to attend without Buddy, but that year she missed 65 days of school—more than one-third of the school year—with seizure activity accounting for about half of her absences.

A devoted advocate, M.B.'s mother sought permission again on the eve of fifth grade for Buddy to accompany M.B. to school, pointing out that M.B.'s seizures were increasing in frequency, which exacerbated the concerns about her attending without Buddy's assistance. But again the principal refused, citing possible distraction, and so once more M.B. started the school year unaccompanied by Buddy. Without her service animal, however, M.B. became anxious and distracted at school, afraid of enduring the increased seizure activity. Her mother therefore met again with the principal to renew her request for Buddy to accompany M.B. to school and to advise the principal that M.B.'s pediatric neurologist had recommended that Buddy "should be at school with her." JA 530. The principal promised to "look into" the request. JA 531.

Unsatisfied with that answer, M.B.'s mother simply began bringing Buddy to school with M.B. in the morning. Each day she did so, however, the principal stopped them at

6

the entrance of the School and refused to allow Buddy to enter. The principal also offered a new explanation: Instead of pointing to the possibility of distraction, the principal said she had discovered that another student in the School was allergic to dogs.

At that point, given M.B.'s growing anxiety and distraction and the medical risks associated with attending school without Buddy, M.B. stayed home from school for more than two months while her mother continued her efforts to obtain an accommodation from the School. Those efforts included leaving telephone messages, having her attorney send letters, and forwarding a note she obtained from M.B.'s pediatrician that explained that, because M.B.'s "seizure activity has escalated and is not always obvious, it is medically necessary for 'Buddy,' [her] trained seizure dog, to be with her 24 hours [a day] / 7 days a week." JA 1396. A teacher at the School also provided the principal with an informational article about seizure alert dogs that detailed how they are able to predict and alert to seizures and give their owners time to move to a safe place, take medication, call for help, and notify others about the impending seizure for later monitoring. And the parents of the student who was allergic to dogs, for their part, informed the principal that they had arranged for allergy treatments for their son and did not want M.B. to be excluded from the School on his behalf.

After weeks of back-and-forth effort, the principal finally agreed that M.B. could return with Buddy, but only on the condition that Buddy at all times wear a special therapeutic shirt designed to decrease allergens. Thus, in January of fifth grade, M.B. finally returned to school, this time with Buddy. But her return was short-lived. The special hypo-allergenic shirt made Buddy overheated, causing him to pant and to fail

7

to alert or respond when M.B. had seizures.  After two weeks of these conditions, M.B.'s mother learned that M.B had slept on the floor of the principal's office for hours after seizing without Buddy's intervention.  The next day, she withdrew M.B. from the School permanently.

Eventually, M.B. was enrolled in the local public school, which allowed Buddy to accompany her.  By that point, however, M.B.'s testing showed that she had fallen too far behind to resume or even to repeat fifth grade.  Instead, she was required to enter as a fourth grader.

## II.     Procedural Background

M.B.'s parents sued the School, asserting that it had failed to accommodate M.B. in violation of § 504 of the Rehabilitation Act (RA), Title III of the Americans with Disabilities Act (ADA), and the Pennsylvania Human Relations Act (PHRA).[3]  After discovery, the School moved for summary judgment on all claims, and the District Court granted that motion as to the ADA and PHRA claims.

Regarding the ADA claim, the Court noted that M.B.'s parents only sought damages and explained that damages are not an available form of relief under Title III of the ADA.  As for the PHRA claim, the District Court summarily stated, "the analysis of an ADA claim applies equally to a PHRA claim," JA 23, and dismissed it on that basis.

---

[3] M.B.'s parents brought additional state law claims, but they do not challenge the District Court's dismissal of those claims on appeal.

8

The District Court then turned to the RA claim. Observing that the substantive standard of liability to prove discrimination under § 504 of the RA was "materially identical" to the standard under the ADA, JA 27 (citation omitted), the Court looked for guidance to the DOJ's regulations implementing the ADA, which require that "reasonable modifications" be made when necessary to avoid disability discrimination, 28 C.F.R. §§ 35.130(b)(7)(i), 36.302(a). It identified two particular ADA regulations pertaining to service animals—one applicable to public entities, *id.* § 35.136, and one applicable to public accommodations, *id.* § 36.302.[4] In both, the DOJ interprets "reasonable modifications" to mean that covered actors "shall modify [their] policies, practices, or procedures to permit the use of a service animal by an individual with a disability." *Id.* §§ 35.136(a), 36.302(c)(1). Determining that the DOJ's interpretation of the ADA was equally applicable to the RA and was therefore "enforceable against [the School] in deciding whether it violated federal law," JA 29, the District Court concluded that there were genuine disputes of material fact as to whether the School failed to accommodate M.B. under the RA and denied its summary judgment motion as to that claim. The parties then proceeded to a jury trial, with the District Court continuing to indicate that the ADA service animal regulations were controlling by, for example, excluding

---

[4] Under Title II of the ADA, "public entities" include all programs of state and local governments. *See* 42 U.S.C. § 12131(1). Under Title III, "public accommodations" include most places that are generally open to the public, including schools. *See id.* § 12181(7). The School concedes that it is a public accommodation subject to Title III of the ADA and its implementing regulations.

testimony from Buddy's trainer about whether it was reasonable for Buddy to wear the hypo-allergenic shirt on the ground that "[r]easonableness has already been determined by D.O.J. regulations." JA 262.

Three days later, however, the District Court sharply reversed course. First, it disallowed deposition testimony about the service animal regulations on the ground that "the A.D.A. is not in this case." JA 810. And second, when it came time for jury instructions and M.B.'s counsel proposed an instruction that mirrored the regulations that the District Court had found enforceable at the summary judgment phase,[5] the Court rejected it, asserting that, at trial, "the standard is different."[6] JA 984.

---

[5] The "Denial of Use of Service Animal" instruction would have read: "The law provides that generally [the School] must modify its policies, practices, or procedures to permit the use of [M.B.]'s service dog, and [M.B.] must be permitted to be accompanied by Buddy in all areas of the [School] where students are allowed to go." JA 210.

[6] In rejecting the instruction, the District Court also took issue with counsel's mistaken citation to the ADA public entity regulation, 28 C.F.R. § 35.136—which does not apply to the School—instead of the materially identical ADA public accommodation regulation, 28 C.F.R. § 36.302—which does. But as the Court was aware of both regulations and we are confident that it sought to advise the jury as to the proper standard under the law, we interpret its rejection of the proposed instruction to mean that it believed, at that point, that the ADA service animal regulations did not bear on the interpretation of "reasonable accommodations" under the RA.

10

Instead, the District Court instructed the jury that, to prevail on a claim for failure to accommodate, plaintiffs were required to "prov[e] by a preponderance of the evidence that the requested accommodations" were "reasonable," and further defined that term as meaning "necessary to avoid discrimination on the basis of a disability," or, "[i]n other words . . . necessary to permit [M.B.] meaningful participation." JA 1007. Only if the plaintiffs proved the accommodations were "necessary to avoid discrimination . . . on the basis of [M.B.]'s disability," the Court advised, would "the burden shift[] to [the School] to prove by a preponderance of the evidence that the requested accommodations were unreasonable." JA 1008.

Apparently confused as to how these instructions related to the need to accommodate service animals, the jury sent the Court a question the same day requesting "up to date specific information re: service dogs pertaining to act #504/ADA." JA 1998. At that point, M.B.'s counsel again urged the Court to instruct the jury on the ADA service animal regulations, but the Court again declined, stating that it had already "g[iven] them the law that relates to this case" and would not "go look for some new law to tell them about or some different law or something that's not been already submitted or given to them." JA 1089. The jury then returned a verdict for the School.

M.B.'s parents timely appealed, seeking reversal of the dismissal of their PHRA claim as well as a new trial on their RA claim on the ground that the District Court did not properly instruct the jury on the applicable law.

11

## III. Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction under 28 U.S.C. § 1291. We review de novo the District Court's decision to grant summary judgment, which "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). Whether jury instructions state the proper legal standard is a legal question over which we exercise plenary review. *United States v. Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995).

## IV. Analysis

Focusing primarily on their RA claim, Appellants argue that because the substantive standards for liability under the RA and the ADA are the same, the service animal regulations interpreting "reasonable modifications" under the ADA apply equally to "reasonable accommodations" under the RA. Therefore, according to Appellants, actors covered by the RA must modify their policies to allow for the use of service animals by individuals with disabilities to the same extent as actors covered by the ADA. For the reasons we explain below, we agree.

First, we explain why we conclude—based on (1) the interplay between the two statutes, (2) case law interpreting them to have identical substantive standards of liability, (3) the DOJ's interpretation of the "reasonable modification" requirement in the ADA service animal regulations, and (4) consonant guidance from the Department of Education (DOE) in the RA context—that the "reasonableness" of an accommodation or a modification under either statute must be

12

interpreted the same way. Thus, it constitutes discrimination under the RA, to the same extent as under the ADA, to refuse to permit disabled individuals to be accompanied by service animals. Second, we address the School's arguments to the contrary. And finally, we consider the ramifications of our holding for the judgment on the RA claim and briefly explain why the dismissal of the PHRA claim must be reversed.

### A. The Relationship Between the RA and the ADA

### 1. Statutory History

To understand the interplay between the RA's "reasonable accommodation" requirement and the ADA's "reasonable modification" requirement, and therefore to determine the relevance of the ADA service animal regulations for actors covered by the RA, we must first understand the relationship between the two statutes.

The Rehabilitation Act of 1973 "was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities." *Helen L. v. DiDario*, 46 F.3d 325, 330 (3d Cir. 1995), *as amended* (Feb. 2, 1995). The heart of the statute, § 504, established that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). This prohibition of discrimination on the basis of a disability included an affirmative obligation, recognized by the Supreme Court in *Alexander v. Choate*, that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee

13

offers" and that federally funded programs were required to make "reasonable accommodations" or "reasonable modifications," although not "fundamental or substantial" ones, when necessary to assure such "meaningful access." 469 U.S. at 300–01 (citation omitted); *see also Ams. Disabled for Accessible Pub. Transp. (ADAPT) v. Skinner*, 881 F.2d 1184, 1192 (3d Cir. 1989) (en banc) (explaining that *Choate* established under the RA a requirement of "reasonable modifications to accommodate the disabled" or a "duty to accommodate").

After nearly two decades of experience with the statute, Congress acknowledged that the RA had "shortcomings and deficiencies," such as "the limited extent of its coverage," that were impeding its effectiveness in eliminating disability discrimination. *Helen L.*, 46 F.3d at 331. Consequently, in 1990, Congress enacted the ADA "as a 'clear and comprehensive national mandate' designed to eliminate discrimination against individuals with physical and mental disabilities across the United States." *McGann v. Cinemark USA, Inc.*, 873 F.3d 218, 221 (3d Cir. 2017) (quoting 42 U.S.C. § 12101(b)(1)). "To effectuate its sweeping purpose," *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001), Congress designed the ADA to fit hand in glove with the RA, leaving intact the "scope of protection . . . under the [RA]," *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 120 (3d Cir. 1998), but extending its reach beyond federally funded programs to three "major areas of public life," *PGA Tour*, 532 U.S. at 675, including employment (Title I), *see* 42 U.S.C. §§ 12111–12117; public entities, i.e., state and local governments and their programs (Title II), *see id.* §§ 12131–12165; and public accommodations (Title III), *see id.* §§ 12181–12189.

14

As relevant here, the extension of these protections in Title III to "public accommodations" was the most far-reaching, as it prohibited discrimination on the basis of a disability in "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" by its owner or operator. 42 U.S.C. § 12182(a). In this way, the ADA brought within its sweep "the wide variety of establishments available to the nondisabled," *PGA Tour*, 532 U.S. at 677, including private schools regardless of whether they receive federal funding,[7] *see* 42 U.S.C. § 12181(7)(j).

Crucially, Title III of the ADA also codified the concept of "reasonable accommodations" that the Supreme Court had recognized for the RA in *Choate*. There, the Court established that liability could be premised on a failure to make "reasonable accommodations," a standard that turned on (1) whether the requested accommodation to the program was "reasonable"; (2) whether it was necessary "to assure meaningful access"; and (3) whether it would represent "a fundamental alteration in the nature of [the] program." *Choate*, 469 U.S. at 300–01 (citation omitted); *see also Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 280 (3d Cir. 2012) (identifying these elements). Mirroring this language, Congress used the same three criteria to define one type of "discrimination" under the ADA as:

> [1] a failure to make reasonable modifications in policies, practices, or procedures, when [2] such

---

[7] Title III also extended to such publicly accessible entities as hotels, restaurants, retail stores, movie theaters, parks, and gymnasiums. *See* 42 U.S.C. § 12181(7).

15

modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless [3] the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).

Also of note, although Congress here used the term "reasonable modifications," it used the term "reasonable accommodations" elsewhere in the ADA without apparent distinction. While Titles II and III defined discrimination to include the failure to make "reasonable modifications," *id.* §§ 12131(2), 12182(b)(2)(A)(ii), Title I, which applied to employers, defined "discrimination" to include "not making reasonable accommodations," *id.* § 12112(b)(5)(A). *See Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) (observing that "Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation[s]'"); *accord McElwee v. County of Orange*, 700 F.3d 635, 640 n.2 (2d Cir. 2012) (noting that "courts use the terms 'reasonable modifications' in Title II and 'reasonable accommodations' in Title I interchangeably") (collecting cases).

Shortly after enacting the ADA, Congress also undertook to amend the RA "to ensure that the precepts and values embedded in the [ADA] [we]re reflected in the [RA]," S. Rep. No. 102-357, at 2 (1992), to specify "congressional findings, purpose, and policy" for the RA, *id.* at 14, and to "reaffirm[] . . . the precepts of the [ADA]"—intending such

16

principles to "guide the policies, practices, and procedures developed under all titles of the [RA]," *id.* To those ends, Congress enacted the Rehabilitation Act Amendments of 1992, Pub. L. No. 102-569, 106 Stat. 4344 (codified as amended in various sections of Title 29), which set forth certain threshold findings, purposes, and policy applicable to the entire act, echoing the ADA.

As a result, the RA, like the ADA, recognizes that disabilities do not diminish the right to full inclusion in American society. *Compare* 29 U.S.C. § 701(a)(3)(F) (finding that "disability . . . in no way diminishes the right of individuals" to "enjoy full inclusion and integration" in the "mainstream of American society"), *with* 42 U.S.C. § 12101(a)(1) (finding that "disabilities in no way diminish a person's right to fully participate in all aspects of society"). Both statutes aim to secure "full participation." *Compare* 29 U.S.C. § 701(c)(3) (affirming the principles of "inclusion, integration, and full participation"), *with* 42 U.S.C. § 12101(a)(7) (seeking "to assure equality of opportunity" and "full participation"). And both statutes target the same "critical areas" where discrimination persists, including education. *Compare* 29 U.S.C. § 701(a)(5) (finding that "individuals with disabilities continually encounter various forms of discrimination" in eleven "critical areas," including education), *with* 42 U.S.C. § 12101(a)(3) (finding that "discrimination against individuals with disabilities persists" in the same eleven "critical areas").

This history teaches that both statutes "aim to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others," *Fry v. Napoleon Cmty. Sch.*,

17

137 S. Ct. 743, 756 (2017),[8] and their requirements of "reasonable accommodations" and "reasonable modifications" are inextricably intertwined. As a general rule, "repetition of the same language in a new statute indicates . . . the intent to incorporate its . . . judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). And here, the terms "reasonable accommodations" and "reasonable modifications" were used interchangeably in RA case law, *see Choate*, 469 U.S. at 300–01; *cf. Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 409–10, 412–13 (1979) (employing similar variations); Congress then codified the requirements of *Choate* in the ADA,[9] 42 U.S.C. § 12182(b)(2)(A)(ii); and Congress itself used the terms "reasonable modifications" and "reasonable accommodations" in the ADA without apparent distinction, *see Robertson*, 500 F.3d at 1195 n.8; *McElwee*, 700 F.3d at 640 n.2. We conclude that, although the statutes may diverge as to the entities they

---

[8] Although the Supreme Court in *Fry* was comparing the RA to Title II of the ADA, applicable to public entities, 137 S. Ct. at 756, "all three titles [of the ADA] have similar purposes, that is, to eliminate discrimination in the sphere each one covers," *Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 433 (3d Cir. 2003).

[9] *See* Katie Eyer, *Rehabilitation Act Redux*, 23 Yale L. & Pol'y Rev. 271, 304 (2005) (describing the "reasonable modification" requirement as "a component of the requirements of § 504 [of the RA] that was well established by case law prior to the passage of the ADA"); *see also Wis. Corr. Serv. v. City of Milwaukee*, 173 F. Supp. 2d 842, 849 (E.D. Wis. 2001) (recognizing that the ADA's "reasonable modification" requirement is "[c]onsistent with case law under the [RA]").

18

cover and remedies they provide, they impose the same substantive liability standard and require a unified approach to the "reasonableness" of accommodations and modifications.

## 2. Case Law

Our conclusion that the RA and the ADA apply the same standard of reasonableness is further compelled by the body of case law interpreting the two statutes.

To begin, when a plaintiff sues under both the RA and the ADA, we often "address both claims in the same breath," *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (reversing summary judgment as to both RA and ADA claims), "constru[ing] the provisions of [both statutes] in light of their close similarity of language and purpose," *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 406 n.4 (3d Cir. 2005) (citation omitted); *accord Frame v. City of Arlington*, 657 F.3d 215, 223–24 (5th Cir. 2011) (en banc) (recognizing that, as the statutes "generally are interpreted *in pari materia*," its "holding applie[d] to both"). Although we may depart from this approach on questions of reach and remedies, we generally apply "the same standard for determination of liability," *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012); *accord S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013); *Argenyi v. Creighton Univ.*, 703 F.3d 441, 447–51 (8th Cir. 2013), in recognition that "the scope of protection afforded" under both statutes, i.e., the "general prohibition[] against discrimination," is materially the same, *Menkowitz*, 154 F.3d at 120.

An essential feature of this "prohibition against discrimination" is, of course, the duty to make "reasonable

19

accommodations" and "reasonable modifications," and while we have not explicitly held that those terms are synonymous, we have assumed as much. *See Haberle v. Troxell*, 885 F.3d 170, 181 n.11 (3d Cir. 2018) (using the phrases "reasonable accommodations" and "reasonable modifications" interchangeably as to the ADA); *Skinner*, 881 F.2d at 1192 (describing the RA as requiring "reasonable modifications to accommodate the disabled" or a "duty to accommodate").

The Supreme Court has done the same. For example, in *Southeastern Community College v. Davis*, the precursor to *Choate*, the Court discussed as actionable under the RA both the "refusal to modify" and the "refusal to accommodate," 442 U.S. at 413, and in *Choate* itself, the Court referenced both "reasonable accommodations" and "reasonable modifications," 469 U.S. at 300–01. Likewise, the Court has recognized that the RA operates "[i]n [a] similar vein" to the ADA, requiring "certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities." *Fry*, 137 S. Ct. at 749 (quoting *Choate*, 469 U.S. at 299–300).

Other Courts of Appeals also have recognized that "[a]lthough Title III of the ADA uses the term 'reasonable modification[s]' rather than 'reasonable accommodation[s],' these terms do not differ in the standards they create." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004) (citation and alteration omitted); *see also Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 n.6 (1st Cir. 2014) (stating that "there is no material difference between the terms"); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 n.5 (4th Cir. 2012) (finding that "[t]he standard for reasonableness under the ADA does not differ from the one employed under the [RA]" and therefore analyzing failure to

accommodate claims under both statutes together (quoting *Fortyune*, 364 F.3d at 1083)).[10]

In short, the case law reinforces the conclusion we draw from the statutes' intertwined histories: The reasonableness of an accommodation or modification is the same under the RA and the ADA. Accordingly, while the text of the RA does not, by itself, resolve whether accommodating the use of service animals by individuals with disabilities is generally reasonable, it is appropriate to consider the regulations and guidance applicable to the ADA's "reasonable modification"

---

[10] In the context of the Fair Housing Act (FHA), courts do distinguish between "reasonable accommodations" and "reasonable modifications." *See Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 538 (6th Cir. 2014) (holding that a "disabled individual alleging unlawful housing discrimination" can rely on either "failure to make a reasonable accommodation . . . or failure to permit a reasonable modification"). But that is because the FHA specifically defines discrimination to include both "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises," 42 U.S.C. § 3604(f)(3)(A), and, separately, "a refusal to make reasonable accommodations in rules, policies, practices, or services," *id.* § 3604(f)(3)(B). The FHA thus uses "modification" and "accommodation" as terms of art, in sharp contrast to the provisions of the ADA applicable here, where "use of the term 'reasonable modifications' is essentially equivalent to . . . use of the term 'reasonable accommodation[s].'" *Robertson*, 500 F.3d at 1195 n.8.

requirement in answering that question. With these principles in mind, we turn to the ADA service animal regulations.

### 3. The Service Animal Regulations

A year after the ADA's enactment, the DOJ, its administering agency, promulgated a regulation that made accommodation of the use of service animals generally reasonable under the "reasonable modification" requirement. *See* 56 Fed. Reg. 35,544, 35,565 (July 26, 1991). This regulation, which applied only to public accommodations under Title III, imported the "reasonable modifications" language from the text of the ADA, *see* 42 U.S.C. § 12182(b)(2)(A)(ii), and further provided that public accommodations "[g]enerally . . . shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 36.302(c)(1) (1992).

Two decades later, the DOJ spoke to the subject again. Recognizing that "there [was] no specific language in the 1991 title II regulation [applicable to public entities] concerning service animals," 75 Fed. Reg. 56,164, 56,191 (Sept. 15, 2010), the DOJ promulgated a regulation for that context, using materially identical language to provide that a public entity "[g]enerally . . . shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 35.136(a).

As the court observed in *Alboniga v. School Board*, 87 F. Supp. 3d 1319 (S.D. Fla. 2015), in an exceptionally careful and thorough analysis of how these regulations inform the "reasonableness" of proposed modifications under the ADA, the service animal regulations are "consistent with and a

22

specific application of" the "reasonable modification" requirement. *Id.* at 1335. They "present[] the DOJ's holistic view, in enforcing the ADA, of when it is reasonable, and when it is unreasonable, to require public entities [and accommodations] to accommodate the use of service animals." *Id.* at 1336.

On the one hand, they establish the "general rule" that requiring covered actors to make modifications to permit the use of service animals is reasonable. *Id.*; *see Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1060 (5th Cir. 1997) (concluding that plaintiff had satisfied his initial burden of establishing the requested modification was "reasonable generally or in the run of cases" and the burden then shifted to the defendant because "[t]he regulation and commentary reflect an administrative determination that modifying a no animals policy to allow a service animal full access with its owner in a place of public accommodation is generally reasonable").

On the other hand, they specify the limited circumstances in which it would be unreasonable to require these actors to allow the use of service animals: if granting access would "fundamentally alter" the nature of the program, 28 C.F.R. §§ 35.130(b)(7), 36.302(a), or pose a "direct threat" to the health or safety of others, *id.* §§ 35.139, 36.208, or if the animal is either "out of control" or "not housebroken,"[11] *id.*

---

[11] The definition of a "service animal" also incorporates certain limitations, as it means "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability," such as by "assisting an individual during a seizure." 28 C.F.R §§ 35.104, 36.104.

23

§§ 35.136(b)(1)–(2), 36.302(c)(2)(i)–(ii); *see also id.* pt. 35, app. A, §§ 35.104, 35.136 (illustrating application of these exceptions with specific examples). Subject to these exceptions, however, the regulations mandate that "[i]ndividuals with disabilities shall be permitted to be accompanied by their service animals in all areas of [a covered actor's facilities] where . . . program participants . . . are allowed to go." *Id.* § 36.302(c)(7); *see also id.* § 35.136(g).

Put differently, if the exceptions are inapplicable, a disabled individual's proposed accommodation of the use of her service animal is reasonable under the ADA as a matter of law. *See Johnson*, 116 F.3d at 1064 (affirming plaintiff's verdict following bench trial because defendant failed to accommodate his use of a service animal and, in view of the service animal regulations and commentary, defendant was required to make such modifications "unless it c[ould] demonstrate either 1) that such modifications would fundamentally alter the nature of the public accommodation or 2) that such modifications would jeopardize the safety of the public accommodation"); *Alboniga*, 87 F. Supp. 3d at 1344 (granting summary judgment in favor of plaintiff on the ground that, where no exception applied, plaintiff's request for the accommodation of her service animal was necessarily "reasonable within the meaning of the regulations implementing the ADA"); *cf. Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995) (reasoning that "a deaf individual's need for the accommodation afforded by a hearing dog" is "*per se* reasonable within the meaning of the [Fair Housing Amendments Act of 1988]").

The exclusivity of these exceptions is apparent not only in the language and structure of the regulations—to which we accord *Chevron* deference unless "arbitrary, capricious or

24

manifestly contrary to the statute," *Helen L.*, 46 F.3d at 332 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)); *see Johnson*, 116 F.3d at 1060–61 (concluding the ADA service animal regulations warrant *Chevron* deference); *Alboniga*, 87 F. Supp. 3d at 1333–37 (same)—but also as confirmed by the DOJ itself in interpreting its regulations, an interpretation to which we must defer "unless . . . 'plainly erroneous or inconsistent with the regulation,'" *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). In the Statement of Interest it filed in *Alboniga*, the DOJ explained that the service animal regulations "reflect the Department's regulatory judgment that requiring [covered actors] to make modifications to permit the use of service animals generally is reasonable, subject to specific, enumerated exceptions." Statement of Interest of the United States at 10, *Alboniga*, 87 F. Supp. 3d 1319 (No. 14-CIV-60085). And that position is consistent with the DOJ's technical assistance, amicus briefs, and enforcement efforts over at least the past decade. *See id.* at 5 n.5 (collecting authorities). So interpreted, the regulations fulfill Congress's intent to ensure "the broadest feasible access be provided to service animals in all places of public accommodation"—permitting their exclusion only "in rare circumstances." 28 C.F.R. pt. 36, app. C, § 36.302; *see id.* pt. 35, app. A, § 35.136.

When we consider these observations against the backdrop of our earlier discussion concerning the equivalence of "reasonable modifications" and "reasonable accommodations," logic dictates that the service animal regulations, although technically interpreting the ADA, are no less relevant to the interpretation of the RA. In the latter context too, the general rule—subject to the same exceptions—

25

is that a grantee must "modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability," 28 C.F.R. § 36.302(c)(1), and must "permit[] [such individuals] to be accompanied by their service animals in all areas of [the grantee's facilities] where . . . program participants . . . are allowed to go," *id.* § 36.302(c)(7). And just as in the ADA context, where no exception applies, the accommodation of such individuals' use of service animals is *per se* reasonable. *Johnson*, 116 F.3d at 1064; *Alboniga*, 87 F. Supp. 3d at 1344; *cf. Bronk*, 54 F.3d at 429.

## 4. Consonant Agency Guidance

Our holding today also finds support in the regulations and informal guidance of other agencies across the landscape of disability law.

The DOE, which implements the RA as it applies to educational institutions, *see generally* 34 C.F.R. pt. 104, has indicated in informal guidance that the accommodation of a disabled student's request to be accompanied by her service animal generally should be deemed reasonable. Specifically, in response to an inquiry about whether barring service dogs from a classroom violated the RA, the DOE stated—without indicating that any additional showing of "reasonableness" was required—that "if not allowing a student to bring a service dog into the classroom would effectively deny the student the opportunity . . . to participate in or benefit from the education program," i.e., if necessity were satisfied, "then the recipient school would be in violation of Section 504 [of the RA] and its implementing regulation."[12] *Letter from Michael L. Williams*,

---

[12] The DOE has promulgated a general regulation providing that federally funded schools may not deny

26

*Assistant Sec'y for Civil Rights, U.S. Dep't of Educ.*, 17 Educ. Handicapped L. Rep. 1027, 1027 (1991). In its administrative adjudications, the DOE has taken a similar position.[13]

For its part, the Department of Housing and Urban Development (HUD) has indicated that the RA may impose even greater obligations as to service animals than its ADA

---

individuals with disabilities "the opportunity to participate in or benefit from the[ir] aid, benefit, or service." 34 C.F.R. § 104.4(b)(1)(i). It has also advised informally that such schools have an obligation to make "reasonable modifications," which "applies under both Section 504 and [the ADA]," and that it views the terms "reasonable accommodation and reasonable modification interchangeably." U.S. Dep't of Educ., Office for Civil Rights, *Frequently Asked Questions About the Rights of Students with Disabilities in Public Charter Schools Under Section 504 of the Rehabilitation Act of 1973*, at 14 n.53, 19 & n.65 (2016) (emphasis omitted), https://www2.ed.gov/about/offices/list/ ocr/docs/dcl-faq-201612-504-charter-school.pdf.

[13] *See, e.g.*, *Ketchum Pub. Sch.*, Case No. 07-17-1250 (U.S. Dep't of Educ. Feb. 12, 2018) (resolution agreement), https://www2.ed.gov/about/offices/list/ocr/docs/investigations /more/07171250-b.pdf (requiring a school district to revise its service animal policy to comply with both statutes); Letter from Melanie Velez, Reg'l Dir., U.S. Dep't of Educ., Office for Civil Rights, to Shane Barnett, Superintendent, Cullman Cty. Sch. (Sept. 19, 2017), https://www2.ed.gov/about/ offices/list/ocr/docs/investigations/more/04171114-a.pdf (finding that evidence of a school district's noncompliance with the service animal regulations was also sufficient evidence to support a finding of noncompliance with the RA).

counterpart.  In a notice regarding the obligations of housing providers under the Fair Housing Act and the RA, HUD explained that the ADA service animal regulations' limited definition of "service animal"[14] "does not limit housing providers' obligations to make reasonable accommodations for assistance animals under . . . Section 504 [of the RA]."  U.S. Dep't of Hous. & Urban Dev., *Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs* 1 (Apr. 25, 2013), https://www.hud.gov/sites/documents/SERVANIMALS_NT CFHEO2013-01.PDF.  Rather, HUD explained, so long as an individual has a "disability-related need for an assistance animal," "[s]ection 504 require[s] the housing provider to modify or provide an exception to a 'no pets' rule or policy" in order "to permit a person with a disability to live with and use an assistance animal(s) in all areas of the premises where persons are normally allowed to go, unless doing so would impose an undue financial and administrative burden or would fundamentally alter the nature of the housing provider's services."  *Id.* at 3.

Finally, two other agencies, in the exercise of their rule-making authority, have interpreted the RA to require accommodation of the use of service animals.  In 2016, the Department of Labor (DOL) promulgated a regulation materially identical to the DOJ's service animal regulations, providing that a recipient of certain federal workforce development funds "shall modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability" unless the animal is "out of

---

[14] *See supra* note 11.

28

control" or "not housebroken."[15] 29 C.F.R. § 38.16(a), (b)(1)–(2). Likewise, a Department of Transportation (DOT) regulation, promulgated in 2010 for "[t]he purpose of . . . carry[ing] out the [ADA] and Section 504 of the [RA] with respect to passenger vessels," 49 C.F.R. § 39.1, established that vessel owners and operators "must permit service animals to accompany passengers with a disability . . . in all locations that passengers can use on a vessel, including in lifeboats," *id.* § 39.91(a)–(b). Another DOT regulation similarly requires airports to establish "relief areas for service animals that accompany passengers" with disabilities. *Id.* § 27.71(h).

The relevant agencies are thus unanimous in mandating that covered actors, as a general matter, accommodate the use of service animals by disabled individuals under both the RA and ADA, i.e., such an accommodation generally will be reasonable as a matter of law. And even though "[r]esponsibility for administering the [RA] was not delegated to a single agency" so that *Chevron* deference may not be due

---

[15] This regulation was promulgated pursuant to the Workforce Innovation and Opportunity Act, which requires that the DOL ensure federal funds are disbursed consistent with various anti-discrimination statutes, including the RA. The agency's responses to comments in the rule-making process also reflect its view that "[t]he final rule [requiring reasonable modifications] creates no new obligations for recipients regarding reasonable accommodations and modifications that were not already required by existing laws. Accommodations in the rule parallel those already required under the ADA and Section 504 of the [RA], as well as those that were required under the [previous] rules." 81 Fed. Reg. 87,130, 87,171 (Dec. 2, 2016).

to all agency interpretations, it is nonetheless the case that "the well-reasoned views of the agencies implementing [this] statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" *Bragdon*, 524 U.S. at 642 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)).

## B.     The School's Counter-Arguments

Notwithstanding the weight of this authority, the School contends that "reasonable accommodations" under the RA should not be interpreted consistently with the ADA service animal regulations. We do not find its arguments persuasive.

As a threshold matter, the School does not question the validity of the service animal regulations or dispute that they constitute reasonable interpretations of the ADA's prohibition of discriminatory practices—including the failure to make reasonable modifications—to which we accord *Chevron* deference. Nor could it, because the service animal regulations, as we have explained, *see supra* Section IV.A.3, clearly "promote[] the statute's overarching goals of ensuring equal opportunity for, and full participation by, individuals with disabilities," *Alboniga*, 87 F. Supp. 3d at 1334; *see also Fry*, 137 S. Ct. at 749 (citing to *Alboniga* as a case that "requir[ed] an accommodation to permit use of a service animal" under the ADA).

Instead, the School points out that the DOJ's service animal regulations technically apply only to claims for "reasonable modifications" under the ADA. We do not disagree: The service animal regulations do not purport to interpret the RA *per se*. But, as we have explained, because the statutes' substantive standards of liability are identical and

30

because "reasonable accommodations" under the RA must be interpreted consistently with "reasonable modifications" under the ADA, *see supra* Section IV.A.1–2, the ADA service animal regulations necessarily inform our interpretation of the RA.

The School also contends that, even if the service animal regulations are otherwise applicable, the unique needs of the education context warrant an exception to avoid imposing "strict liability" on schools that are not equipped to accommodate service animals. Appellee's Br. 20. Congress, however, has given no indication that the use of service animals should be less accommodated in the school setting than in other settings covered by the RA or the ADA. To the contrary, it made a specific finding in the RA that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . education," 29 U.S.C. § 701(a)(5), just as it did in the ADA, 42 U.S.C. § 12101(a)(3). It also instructed that "*all* programs, projects, and activities receiving assistance . . . shall be carried out in a manner consistent with the principles of . . . inclusion, integration, and full participation." 29 U.S.C. § 701(c), (c)(3) (emphasis added). We therefore decline to depart from our usual rule of construing anti-discrimination statutes such as the RA to "comport[] with th[eir] broad remedial purposes," *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 263 (3d Cir. 2006)—purposes that would be critically undermined if we interpreted the RA to permit a school's exclusion of service animals for the very students who cannot meaningfully access educational benefits without them.

As for strict liability, claims alleging failure to accommodate under the RA involve the same tripartite inquiry as those under the ADA: (1) whether the requested accommodation is reasonable; (2) whether it is necessary; and

31

(3) whether it would fundamentally alter the nature of the program. *Compare Choate*, 469 U.S. at 300–01 (RA), *with PGA Tour*, 532 U.S. at 683 n.38 (ADA). The service animal regulations inform only one of those inquiries, reasonableness, and do not dispense with the other two. *See PGA Tour*, 532 U.S. at 682 (affirming that "an accommodation might be reasonable but not necessary"); *Skinner*, 881 F.2d at 1192 (explaining that while some "modifications may be necessary to avoid discrimination," more "substantial modifications are not required by [the RA]"). Any mandate imposed by the service animal regulations is also subject to specified conditions and exceptions. *E.g.*, 28 C.F.R. §§ 35.136(b)(1)–(2), 36.302(c)(2)(i)–(ii). Applying their logic to schools under the RA thus hardly ushers in an era of unrestrained liability.

The upshot of our analysis—including the statutory histories, case law, and DOJ and other agency guidance—is that, under the RA, just as under the ADA, a covered actor ordinarily must accommodate the use of service animals by individuals with disabilities. As a result, although as a general matter the "reasonableness" of an accommodation under the RA "must be decided on a case-by-case basis," *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1385 (3d Cir. 1991), the accommodation of a disabled person's request to be accompanied by her service animal—absent exceptional circumstances—is *per se* reasonable, *see Johnson*, 116 F.3d at 1064; *Alboniga*, 87 F. Supp. 3d at 1344. And if necessity is then also established, so is liability. *See Choate*, 469 U.S. at 300–01; *Skinner*, 881 F.2d at 1192.

## C.    Application to This Case

We now turn to Appellants' contention that, in view of the RA's requirement of a "reasonable accommodation"

concerning service animals, the District Court did not correctly instruct the jury on the applicable law. The jury instructions stated that, for a claim under the RA for failure to accommodate, "the plaintiffs have the initial burden of proving by a preponderance of the evidence that the requested accommodations they seek were reasonable. That is, necessary to avoid discrimination on the basis of disability. In other words, the requested accommodations were necessary to permit [M.B.] meaningful participation." JA 1007. The jury was further instructed that only if it found that plaintiffs had met that burden would "the burden shift[] to [the School] to prove by a preponderance of the evidence that the requested accommodations were unreasonable." JA 1008.

These instructions were flawed for two reasons. First, they advised the jury that M.B.'s parents had the initial burden to prove their requested accommodation was reasonable when—in view of the service animal regulations and the fact that no exception to the regulations' mandate was invoked by the School, let alone appears applicable[16]—their requested

---

[16] The School did not suggest, for example, that allowing Buddy to accompany M.B. would "fundamentally alter the nature of the . . . program," 28 C.F.R. § 36.302(a), or that Buddy was "out of control" or "not housebroken," *id.* § 36.302(c)(2)(i)–(ii). Indeed, the only explanations it offered for refusing to make that accommodation were perplexing and evolving, including the possibility that students would find Buddy distracting, when it would seem the prospect of their classmate seizing without advance warning would be far more of a distraction, and the allergies of another student, when that student's parents disavowed the need for Buddy's exclusion and that very ground—in guidance applicable to the School as

33

accommodation was reasonable as a matter of law. *See supra* Section IV.A.3. Second, the instructions conflated the RA's requirement that the accommodation be reasonable with its separate and distinct requirement that the accommodation be necessary. *See PGA Tour*, 532 U.S. at 682; *cf.* Third Circuit Model Civil Jury Instructions § 9.1.3 (Mar. 2018) (instructing the jury, in the ADA employment discrimination context, to make distinct findings that the defendant "was informed of the need for an accommodation" and that "the accommodation(s) in dispute . . . would have been reasonable"). The jury thus was not properly instructed.

Our inquiry does not end there, however. The School urges us to affirm on the alternative ground that the erroneous jury instructions were harmless, that is, "that there is a 'high probability' that the error did not prejudice [Appellants'] substantive rights." *Habecker v. Clark Equip. Co.*, 942 F.2d 210, 216 (3d Cir. 1991) (quoting *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 924 (3d Cir. 1985)). Specifically, the School contends there is a high probability that the jury ruled in its favor because it could not, on this record, have made a finding of necessity.

Having carefully reviewed the record, we cannot agree. To the contrary, there was compelling evidence before the jury that having Buddy accompany M.B. was indeed necessary to provide "meaningful access to the benefit that the grantee

---

a "public accommodation" under the ADA—had been deemed "not valid" as a reason for "denying access . . . to people using service animals," U.S. Dep't of Justice, Civil Rights Div., *Service Animals* (July 12, 2011), https://www.ada.gov/service_animals_2010.htm.

offer[ed]," *Choate*, 469 U.S. at 301, that is, in the education context, to ensure "meaningful participation in educational activities and meaningful access to educational benefits," *Ridley Sch. Dist.*, 680 F.3d at 280. And while a plaintiff "may not insist on a particular accommodation if another reasonable accommodation was offered," Third Circuit Model Civil Jury Instructions § 9.1.3, such an alternative, in order to defeat necessity and serve as a defense, also must provide that "meaningful access," *Choate*, 469 U.S. at 301.

By that measure, the alternatives offered by the School fell woefully short. With the assistance of school staff alone and in the absence of Buddy's therapeutic services, M.B. was subjected to additional safety risks, such as the onset of seizures without prior notice, hours of lying in the principal's office without intervention, and significant increased anxiety that medical providers indicated was contributing to increased seizure activity. Ultimately, M.B. had such a gaping educational deficit that she could not even qualify in the public school system to repeat fifth grade, regressing instead to the fourth. The record also indicates that the alternative of having Buddy wear the hypo-allergenic shirt—of dubious purpose after the allergic student's parents advised the principal they had arranged for allergy treatments and did not want M.B. excluded from the School on their son's behalf—caused Buddy to fail to respond when M.B. had seizures. In any event, as the DOJ has interpreted its service animal regulations, "[a]llergies and fear of dogs are not valid reasons for denying access or refusing service to people using service animals," U.S. Dep't of Justice, Civil Rights Div., *Service Animals* (July 12, 2011), https://www.ada.gov/service_animals_2010.htm, and that guidance, like the ADA service animal regulation itself, was

35

fully applicable to the School as a "public accommodation" under the ADA, *see supra* note 4.

Bearing in mind this record and the jury's own question seeking "specific information re: service dogs pertaining to act #504/ADA," JA 1998, the School has hardly shown a "high probability" that the jury would have ruled in its favor if properly instructed. To the contrary, it is hard pressed to show that any reasonable jury, properly instructed, could so rule.[17] We therefore will vacate and remand for the District Court to determine whether there is any remaining genuine issue of material fact concerning the School's liability or whether, in view of our holding today, trial should be limited to the matter of damages.

Finally, we briefly address the dismissal of the PHRA claim, which we will reverse. The District Court observed that "the analysis of an ADA claim applies equally to a PHRA claim," JA 23, which is true as far as it goes, *see Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). But it then dismissed both claims on the ground that M.B.'s parents

---

[17] We also note that where, as here, a trial judge rules early in litigation that a rule of law applies to the facts of the case, and that ruling shapes the course of trial and the parties' strategy, but then the judge reverses course at the jury instruction stage, there may be a risk of prejudice to the parties under the law of the case doctrine. *See In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009). We need not consider whether M.B. suffered such prejudice here, however, because our conclusions that the jury instructions were erroneous and that the error was not harmless dictate our disposition.

could not obtain damages under the ADA. The problem is that, while the liability standard for the PHRA and the ADA is the same, the remedies are not: The PHRA expressly permits suits for damages. *See* 43 Pa. Stat. and Cons. Stat. Ann. § 962(c)(3). Although we nonetheless could affirm if remand would be futile, *see Caver v. City of Trenton*, 420 F.3d 243, 264–65 (3d Cir. 2005), it would not be in this case. Even aside from the significance of the ADA service animal regulations for the PHRA, *see Taylor*, 184 F.3d at 306–07 (discussing an ADA regulation as to a PHRA claim), the PHRA in its own right prohibits public accommodations from "deny[ing] . . . any person due to use of a guide or support animal because of the . . . physical handicap of the user" any of their "accommodations, advantages, facilities or privileges," 43 Pa. Stat. and Cons. Stat. Ann. § 955(i)(1). It was therefore reversible error to dismiss Appellants' PHRA claim.

## V.    Conclusion

For the foregoing reasons, we will vacate the judgment on the RA claim, reverse the dismissal of the PHRA claim, and remand for further proceedings consistent with this opinion.

37