MORITZ, Circuit Judge.
Some statutes are so “enigmatic” that we must resort to diagraming their clauses in an effort to discern their meanings. See, e.g., United States v. Rentz, 777 F.3d 1105, 1106, 1109 (10th Cir. 2015) (parsing 18 U.S.C. § 924(c)(l)(A)’s “bramble of prepositional phrases”). Others are so abstruse that we must employ canons of statutory interpretation to define their terms. See, e.g., United States v. Brune, 767 F.3d 1009, 1022-23 (10th Cir. 2014), cert. denied, — U.S. -, 135 S.Ct. 1469, 191 L.Ed.2d 414 (2015) (applying canon of ejusdem generis to 18 U.S.C. § 2252A(a)(5)(B)). Still others are so ambiguous that we must comb the annals of legislative history to divine Congress’ intent. See, e.g., Woods v. Standard Ins. Co., 771 F.3d 1257, 1265-66 (10th Cir. 2014) (examining legislative history because *1229 meaning of 28 U.S.C. § 1382(d)(4)(A) wasn’t apparent from its plain language).
But the statute we are tasked with interpreting here, 42 U.S.C. § 12181(7)(F), isn’t one of those statutes. Section 12181(7)(F) makes “service establishments” public accommodations for purposes of Title III of the Americans with Disabilities Act (ADA). Title III, in turn, generally prohibits public accommodations from discriminating against individuals on the basis of disability. See 42 U.S.C. § 12182(a). Here, the district court[1] concluded that plasma-donation centers (PDCs) aren’t service establishments because, unlike § 12181(7)(F)’s enumerated examples, PDCs don’t provide a service to the public in exchange for a fee.
We find this superficial distinction irrelevant. Under the plain language of § 12181(7)(F), a PDC is a “service establishment” for two exceedingly simple reasons: It’s an establishment. And it provides a service. This straightforward conclusion •is entirely consistent with the goal and purpose of Title III. Thus, we need not look beyond the plain language of § 12181(7)(F) to determine that a PDC constitutes a public accommodation. Because the district court erred in concluding otherwise — and in dismissing the underlying action on that basis — we reverse and remand for further proceedings.
Background
Brent Levorsen suffers from various psychiatric disorders, including borderline schizophrenia.[2] For years, Levorsen has donated plasma in exchange for money in an effort to supplement his limited income. And in May 2013, he attempted to do just that at a Salt Lake City branch of Octap-harma Plasma, Inc.
Octapharma operates multiple PDCs, including the one at issue in this case. At those facilities, Octapharma collects donors’ plasma using a process called plas-mapheresis. During that process, Octap-harma draws and mechanically processes each donor’s blood, separating and reserving the plasma before returning the red blood cells to the donor. Octapharma pays its donors for this plasma, which it then sells to pharmaceutical companies.
When an Octapharma employee learned that Levorsen suffers from borderline schizophrenia, the employee became concerned that Levorsen might have a schizophrenic episode while donating and dislodge the collecting needle, possibly injuring himself or someone else. The employee thus advised Levorsen that he was ineligible to donate plasma. Levorsen then provided Octapharma with a signed form from his psychiatrists, who both indicated that Levorsen is medically suitable to donate plasma twice a week. When Octap-harma maintained its refusal to allow Le-vorsen to donate, he brought this action under Title III of the ADA.
Title III generally prohibits public accommodations from discriminating against individuals on the basis of disability. § 12182(a). For purposes of Title III, “service establishment^]” constitute public accommodations. § 12181(7)(F). In his complaint, Levorsen alleged that PDCs like Octapharma are public accommodations because they are service establishments. And he maintained that when it denied him the opportunity to donate plasma in exchange for payment based solely on his *1230 borderline schizophrenia, Octapharma im-permissibly discriminated against him on the basis of his disability in violation of Title III of the ADA.
Octapharma moved to dismiss under Fed. R. Civ. P. 12(b)(6). Octapharma didn’t dispute that Levorsen’s borderline schizophrenia constitutes a disability for purposes of Title III. Nor did it dispute that Octapharma prohibited Levorsen from donating plasma based on that disability. Instead, it argued only that PDCs like Oc-tapharma are not public accommodations for purposes of Title III. More specifically, Octapharma argued that PDCs are not service establishments because — unlike § 12181(7)(F)’s enumerated entities— PDCs don’t provide a service to the public in exchange for a fee.
The district court agreed. It reasoned that rather than accepting payment from the public in exchange for a service that PDCs provide, PDCs instead offer payment to the public in exchange for a service that PDCs receive. And because PDCs differ from § 12181(7)(F)’s enumerated entities in that regard, the district court concluded that PDCs are not service establishments. Consequently, it ruled, PDCs are not public accommodations for purposes of Title III.[3]
Based on this conclusion, the district court granted Octapharma’s Rule 12(b)(6) motion and dismissed the action with prejudice. Levorsen appeals.
Discussion
“Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals.” PGA Tour, Inc. v. Martin, 532 U.S. 661, 674, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001). To that end, § 12182(a) prohibits discrimination “on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of -any place of public accommodation.” And § 12181(7)(F) clarifies that, among other entities, the following “are considered public accommodations”: “a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment.”
Section 12181(7)(F)’s enumerated examples aren’t exhaustive, see 28 C.F.R. pt. 36, app. C, at 893; rather, they serve as mere illustrations, see U.S. Dep’t of Justice, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities § III-1.2000, www.ada.gov/taman3.html (last visited June 29, 2016). Moreover, courts must construe § 12181(7)(F) liberally to afford individuals with disabilities access to the same establishments available to those without disabilities. PGA Tour, 532 U.S. at 676-77, 121 S.Ct. 1879; see also Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 983 (10th Cir. 2002) (“In our review of the antidiscrimination laws we must be mindful of their remedial purposes, and liberally interpret their provisions to that end.” (quoting Wheeler v. Hurdman, 825 F.2d 257, 262 (10th Cir. 1987))).
Citing these dictates, Levorsen argues that the district court erred in failing to liberally construe the term “service establishment” to encompass PDCs. According to Levorsen, the district court unneeessari *1231 ly employed canons of statutory interpretation and impermissibly read into § 12181 (7)(F) language that doesn’t appear there. As a result, Levorsen asserts, the district court arrived at an unacceptably narrow definition of “service establishment.” Instead, Levorsen argues, the district court should have given the term “service establishment” its plain meaning and defined it as an establishment that provides a service. And because PDCs unquestionably satisfy this definition, he concludes, they constitute public accommodations for purposes of Title III.
Exercising de novo review, see Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009), we agree.
We begin, as we must, with the plain language of § 12181(7)(F). See St. Charles Inv. Co. v. Comm’r, 232 F.3d 773, 776 (10th Cir. 2000) (“As in all cases requiring statutory construction, ‘we begin with the plain language of the law.’ ” (quoting United States v. Morgan, 922 F.2d 1495, 1496 (10th Cir. 1991))). Under § 12181(7)(F), a “service establishment” is a public accommodation for purposes of Title III. Thus, the question before us is whether, under the plain language of § 12181(7)(F), a PDC like Octapharma is a service establishment.
An establishment is a “place of business” or “a public or private institution ([such] as a school or hospital).” Webster’s Third New International Dictionary 778 (2002) [hereinafter Webster’s]. And a service is “conduct or performance that assists or benefits someone or something,” or “useful labor that does not produce a tangible commodity.” Id. at 2075. Accordingly, we conclude that a service establishment is a place of business or a public or private institution that, by its conduct or performance, assists or benefits someone or something or provides useful labor without producing a tangible good for a customer or client. See Brune, 767 F.3d at 1022 (suggesting that in “many instances, simply resorting to a dictionary definition” of a statute’s terms may be “helpful”)[4]; In re Hamilton Creek Metro. Dist., 143 F.3d 1381, 1385 (10th Cir. 1998) (noting that words’ ordinary meanings “may be found by aid of commonly accepted dictionary definitions”). In other words, a service establishment is — unsurprisingly—an establishment that provides a service.
Octapharma resists this straightforward conclusion. It insists that rather than simply combining the ordinary meanings of the terms “service” and “establishment,” we must instead apply two canons of statutory interpretation: ejusdem gener-is and noscitur a sociis. These canons counsel, respectively, that (1) “when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration,” Norfolk & W. Ry. Co. v. Am. Train Dispatchers’ Ass’n, 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), and (2) “a word is known by the company it keeps,” Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961).
As the district court pointed out below, the specific entities listed in § 12181(7)(F) — laundromats, dry-cleaners, *1232 banks, barber shops, beauty shops, travel services, shoe repair services, funeral parlors, gas stations, lawyers’ offices, accountants’ offices, pharmacies, insurance offices, health care providers’ professional offices, and hospitals — happen to share at least one common trait: each traditionally receives some form of payment from its customers, rather than providing one to them. Thus, Octapharma reasons, Congress’ choice to employ these specific terms necessarily restricts the meaning of the more general term “service establishment” to other entities that also share this same characteristic.
But giving the term “service establishment” its ordinary meaning (i.e., an establishment that provides a service) yields neither ambiguity nor an irrational result. See Edwards v. Valdez, 789 F.2d 1477, 1481 (10th Cir. 1986) (“It is a well[-]established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls.”). In fact, giving the term its ordinary meaning achieves just the opposite: it yields a broad definition that is entirely consistent with Title Ill’s aim of affording individuals with disabilities access to the same establishments available to those without disabilities. See PGA Tour, 532 U.S. at 676-77, 121 S.Ct. 1879.
Under these circumstances, we won’t bend over backwards to give the term “service establishment” a definition that is more- narrow than the plain meaning of its component parts. In fact, such interpretative gymnastics are not only unnecessary here, they’re inappropriate given our duty to liberally construe § 12181(7)(F). See id. Accordingly, we decline to apply ejusdem generis and noscitur a sociis. Instead, we begin and end with the plain meaning of the words that Congress- employed. A service establishment is an “establishment” that provides a “service” as we define those terms above. See Woods v. Standard Ins. Co., 771 F.3d 1257, 1263 (10th Cir. 2014) (“[I]f the statutory language is clear, our analysis ordinarily ends.” (quoting Coffey v. Freeport McMoran Copper & Gold, 581 F.3d 1240, 1245 (10th Cir. 2009))); CBS Inc. v. PrimeTime Joint Venture, 245 F.3d 1217, 1225 n.6 (11th Cir. 2001)[5] (explaining that “clear language of a statutory provision holds a status above that of any other canon of construction, and often vitiates the need to consider any of the other canons”).
In any event, even if giving the phrase “service establishment” its ordinary meaning did result in a definition we found to be ambiguous or irrational, employing the canons of statutory interpretation that Oc-tapharma cites wouldn’t clarify matters. True, applying ejusdem generis and nosci-tur a sociis might indicate that we should refrain from treating PDCs as service establishments because — unlike § 12181(7)(F)’s enumerated examples— they provide compensation to, rather than accept compensation from, their customers. However, another rule of statutory interpretation counsels against reading such a direction-of-compensation requirement into the statute when one doesn’t appear there. See United States v. Sturm, 673 F.3d 1274, 1279 (10th Cir. 2012) (noting that we “must ‘ordinarily resist reading words or elements into a statute that do not appear on its face.’ ” (quoting Bates *1233 v. United States, 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997))); see also Chickasaw Nation v. United States, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001)[6] (“Specific canons ‘are often countered ... by some maxim pointing in a different direction.’” (alteration in original) (quoting Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001))). In light of these contradictory suggestions, we think that looking beyond the plain language of the statute would serve only to manufacture ambiguity where none exists.
But if we had to resolve that manufactured ambiguity, we would next examine the legislative history. See United States v. Quarrell, 310 F.3d 664, 669 (10th Cir. 2002). Here, that history bolsters our decision to refrain from concluding that an entity is a service establishment only if it is “similar” to § 12181(7)(F)’s enumerated examples. See, e.g., H.R. Rep. No. 101-485, pt. 3, at 54 (1990), as reprinted in 1990 U.S.C.C.A.N. 445, 477 (explaining that “[a] person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the examples listed in the definition”; instead, he or she need only “show that the entity falls within the overall category”). In fact, Congress changed the language in § 12181(7)(F) • from “other similar service establishments” to “other service establishments,” presumably to make clear that a particular business need not be similar to the enumerated examples to constitute a' service establishment.[7] Compare H.R. Rep. No. 101-485, pt. 4, at 56 (1990) (emphasis added), as reprinted in 1990 U.S.C.C.A.N. 512, 545, with § 12181(7)(F). Cf 136 Cong. Rec. 11,472 (1990) (explaining, with reference to 42 U.S.C. § 12181(7)(E), that one of the changes “adopted in the final bill ... was to delete the word ‘similar’ ” so that “a person alleging discrimination does not have to prove that a particular business is similar to one of the businesses listed ... but rather, that the business falls within ■ the general category described”).
So whether we confine our analysis to, or extend our analysis beyond, the plain language of § 12181(7)(F), the result is the same: service establishments are establishments that provide a service, regardless of *1234 whether they provide or accept compensation as part of that process.
The only remaining question before us is whether PDCs like Octapharma satisfy that definition. We conclude that they do. PDCs like Octapharma are “place[s] of business.” Webster’s, supra, at 778. And they “assist[ ] or benefit[ ]” those who wish to provide plasma for medical use — whether for altruistic reasons or for pecuniary gain — by supplying the trained personnel and medical equipment necessary to accomplish that goal. Id. at 2075. Finally, while PDCs may ultimately “produce a tangible good”[8] for pharmaceutical companies in the form of plasma, they don’t “produce a tangible good” for individuals like Levorsen, who seek to use their plasma-procurement services. Id. Rather, PDCs simply “assist[]” those individuals in accomplishing their goal of providing plasma. Id. Accordingly, we conclude that PDCs like Octapharma are service establishments under § 12181(7)(F). And because they are service establishments under § 12181(7)(F), they are public accommodations for purposes of Title III.[9]
Conclusion
Because Octapharma is an establishment that provides a service, it is a service establishment under the plain language of § 12181(7)(F). And even if that weren’t unambiguously the case, the relevant legislative history and our duty to liberally construe the statute would lead us to the same conclusion.
*1235 Octapharma is a public accommodation for purpose of Title III. Because the district court erred in finding otherwise and in dismissing the action on that basis, we reverse and remand for further proceedings.

. A magistrate judge heard the case upon the parties' consent. See Fed. R. Civ. P. 73.

. We take the bulk of these facts from Levor-sen’s complaint. See Cressman v. Thompson, 719 F.3d 1139, 1152 (10th Cir. 2013) (noting that we accept the complaint’s well-pleaded factual allegations as true at motion-to-dismiss stage).

. The district court also rejected Levorsen's argument that Octapharma constitutes a “professional office of a health care provider” under § 12181(7)(F). Because Levorsen has abandoned this argument on appeal, we need not address it. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived_”).

. The dissent cites Bruñe as an example of a case in which we looked beyond the dictionary definition of the term at issue to canons of statutory construction. See Dissent 1237. But we did so only because that term’s multiple dictionary definitions "preclude[d] an obvious, unitary usage.” Brune, 767 F.3d at 1022. Here, on the other hand, everyone seems to agree on "an obvious, unitary” definition of the term “service.” Id.', see Aplt. Br. 13; Aplee. Br. 16; Dissent 1240 n.5. And neither Octapharma nor the dissent offers a definition of "establishment” that is at odds with the one we arrive at here. Thus, we find Bruñe distinguishable.

. The dissent quotes the Eleventh Circuit's decision in CBS Inc. to bolster its assertion that "canons of statutory construction are aids in construing the language itself — not tools to be relied on only in the face of ambiguity.” Dissent 1237-38. But as the Eleventh Circuit made clear in a footnote, a statute’s plain language "often vitiates” any need to resort to the canons in the first place. CBS Inc., 245 F.3d at 1225 n.6. That is exactly the case here. Section 12181(7)(F)’s plain language "vitiates” any need to apply ejusdem generis or noscitur a sociis. Id.

. The dissent cites Chickasaw Nation for the proposition that we should employ the canons to discern § 12181(7)(F)’s plain meaning. Dissent 1236. But notably, Chickasaw Nation ultimately declined to apply the canons upon which the petitioner relied, in part because the application of those canons "would produce an interpretation [of the statute at issue] that ... would conflict with the intent embodied in the statute Congress wrote.” 534 U.S. at 94, 122 S.Ct. 528 (noting that "canons are not mandatory rules”). Given our duty to construe § 12181(7)(F) liberally to afford individuals with disabilities access to the same establishments available to those without disabilities, see PGA Tour, 532 U.S. at 676-77, 121 S.Ct. 1879, applying ejusdem generis and noscitur a sociis in this case would produce the same result. Accordingly, Chickasaw Nation only lends further support to our decision to refrain from applying these canons.

. The dissent purports to explain why it can ignore this legislative history, noting that “we only turn to extrinsic sources such as legislative history for illumination after we have been unsuccessful in discerning Congress’s intent from the words of the statute itself— including through the use of canons of statutory interpretation.” Dissent 1238 n.l. We wholeheartedly agree with the dissent that examining the legislative history is unnecessary in this case, albeit for the same reasons that we also find it unnecessary to apply the canons. But even if we assume that we must apply the canons, the result of that application is so ambiguous as to require us to examine the legislative history as well. And that history makes it abundantly clear that the dissent’s approach does precisely what Congress warned against doing: it reads a similarity requirement into § 1218 l(7)(F)’s "other service establishment” clause. See Dissent 1239-43.

. Both the dissent and Octapharma characterize PDCs as manufacturers. See Dissent 1243-44; Aplee. Br., 13-19. But neither provides any authority establishing that an entity can't simultaneously be both a manufacturer and a service establishment for purposes of § 12181(7)(F), especially if — as is the case here — that entity provides a service to some customers while producing a tangible good for others. In fact, Octapharma implicitly acknowledges that entities can simultaneously perform different functions for different customers or clients. See Aplee. Br. 15 n. 6 (characterizing pawn shops and used record stores as "sales establishments" for purposes of § 12181(7)(E) because, while these entities buy goods from some members of the public, they sell goods to others). Moreover, we question the dissent’s likening of PDCs to paper mills. See Dissent 1244. Unlike PDCs, paper mills don’t typically hold themselves open as accepting source product from individual members of the public. PDCs, on the other hand, are public-facing businesses. Given the ADA’s goal of affording individuals with disabilities access to the same establishments available to those without disabilities, see PGA Tour, 532 U.S. at 676-77, 121 S.Ct. 1879, this is a relevant distinction.

. Octapharma insists this conclusion will put PDCs in an untenable position by creating a conflict between the ADA and certain regulations promulgated by the Food and Drug Administration. See, e.g., 21 C.F.R. § 606.100(b)(1) (requiring PDCs to establish "[c]riteria used to determine donor eligibility, including acceptable medical history criteria”); 21 C.F.R. § 630.10(a) (noting that PDCs must determine donor eligibility, and that donors aren’t eligible if "not in good health” or if PDC identifies "factor(s) that may cause the donation to adversely affect” a donor’s health or the "safety, purity, or potency of the blood or blood component”). We find this argument unavailing. As the United States as amicus curiae points out, the Department of Justice’s Title III regulations explicitly allow public accommodations to “impose legitimate safety requirements that are necessary for safe operation,” as long as those requirements are "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.” U.S. Reply Br. 3 (quoting 28 C.F.R. § 36.301(b)). In any event, we do not hold today that Octapharma must allow Levorsen to donate plasma. Nor do we take a position on whether Octapharma unlawfully discriminated against Levorsen under § 12182(a). We hold only that Levorsen has access to Octap-harma as a public accommodation. Thus, we reject Octapharma’s suggestion that our holding is fundamentally irreconcilable with the FDA regulations governing PDCs.