PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 18-3415 & 18-3501

———————

GEORGE F. MATHEIS, JR.,

Appellant/Cross-Appellee

v.

CSL PLASMA, INC.,

Appellee/ Cross-Appellant

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1-17-cv-00785)
District Judge: Honorable Sylvia H. Rambo

———————

Argued June 18, 2019

Before: AMBRO, RESTREPO, and FISHER, Circuit Judges

(Opinion filed August  30, 2019)

Rees Griffiths
Zachary E. Nahass (Argued)
CGA Law Firm
135 North George Street
York, PA  17401

     Counsel for Appellant

Bruce J. Douglas (Argued)
Ogletree Deakins Nash Smoak & Stewart
225 South Sixth Street, Suite 1800
Minneapolis, MN  55402

Donald D. Gamburg
Rachel C. Stone
Ogletree Deakins Nash Smoak & Stewart
1735 Market Street, Suite 3000
Philadelphia, PA  19103

     Counsel for Appellee

Lauri A. Mazzuchetti
Kelley Drye & Warren
One Jefferson Road, 2nd Floor
Parsippany, NJ  07054

John T. Delacourt (Argued)
Joshua Penrod
Plasma Protein Therapeutics Association
3050 K Street, NW, Suite 400
Washington, DC  20007

     Counsel for Amicus Appellee/Cross Amicus Appellant
     The Plasma Protein Therapeutics Association

OPINION OF THE COURT

AMBRO, Circuit Judge

Congress, when it passed the Americans with Disabilities Act ("ADA"), found that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." 42 U.S.C. § 12101(a)(1). The remedy for this finding was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). But is it discrimination for an establishment, in the name of safety, to bar everyone who uses a psychiatric service animal, including someone who safely participated more than four score times without assistance?

George Matheis, a retired police officer who has successfully managed a diagnosis of post-traumatic stress disorder ("PTSD"), routinely and safely donated plasma roughly 90 times in an 11-month period at CSL Plasma, Inc.'s plasma donation facility. CSL barred him from making further donations when he brought his new service dog, Odin, to the facility the next time. It reasoned that it has a policy to bar any individual who is prescribed daily more than two separate anxiety medications or who uses a service animal to manage anxiety.[1] In its view, these people are categorically unsafe to donate plasma. The company required Matheis to provide a

---

[1] The parties agree the two anxiety medications rule is not relevant to this appeal.

letter from his doctor stating he had no need for a service animal before it would screen him for further plasma donation. He sued, lost, and appeals to us.

We have two issues. We determine first whether plasma donation centers—facilities where members of the public have their plasma extracted in exchange for money—are subject to the ADA's prohibition on unreasonable discrimination. This turns on whether these facilities are "service establishments" under 42 U.S.C. § 12181(7)(F), which has produced a circuit split between the Tenth and Fifth Circuits. We conclude, like the District Court here, that the Tenth Circuit got it right: the ADA applies to plasma donation centers.

So we next consider the question posed initially, whether CSL violated the ADA by imposing a blanket ban on prospective donors who use a psychiatric service animal. Here we part with the District Court. Public accommodations like CSL must permit disabled individuals to use service animals unless they can show a regulatory exception applies. CSL has failed to provide evidence to satisfy the relevant exception here—that any safety rule "be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 36.301(B). Thus we reverse the grant of summary judgment and remand.

## I. Factual Background

CSL owns and operates a plasma donation facility in York, Pennsylvania. Its business is collecting human blood plasma from the public and selling it to third parties. It screens prospective donors for known health risks, extracts plasma from qualifying individuals, freezes it, and then ships it to manufacturing plants to be made into medicines. The donation process is intense; each session lasts as long as two hours, and donors, who give blood as often as twice a week, must each

4

time pass an individualized screening process. This process includes a check of the donor's blood pressure and protein levels, along with questions to see how the donor is feeling and to check that he or she has not engaged in risky activities. CSL pays its donors as much as several hundred dollars a month for their plasma.

Matheis was involved in a deadly shooting incident while on duty as a SWAT officer with his police department in 2000. After that incident, he had problems socializing and was soon diagnosed with PTSD. His condition sometimes causes him to suffer panic attacks when exposed to crowded or confined spaces, altercations, or helicopter noise. He retired from the police force in 2007 to become a small business owner.

In 2016, Matheis decided to donate plasma to raise extra money. As noted, he did so approximately 90 times during that year at the CSL facility in York. These went off without a hitch, and CSL paid Matheis between $250-300 a month for his donations.

In October 2016, Matheis's eldest daughter enlisted in the Navy. Seeing the stress that her leaving caused her father, she bought him a dog, Odin, to help him cope with her absence. Odin was trained as a service dog for Matheis soon thereafter.

During Odin's initial training, Matheis brought him to CSL to introduce him to the facility. Immediately on entering the building, his phlebotomist (someone trained to draw blood from patients or donors) told him he could not have a dog on the premises. Matheis did not undergo CSL's individualized assessment to determine if he could safely donate that day; instead his phlebotomist referred him to the CSL nurses' station. There he explained that Odin was a service animal that helped him manage his PTSD. The nurse referred him to a CSL

5

manger, who explained that, under its policies, CSL permitted service animals for the blind but not for anxiety. Matheis again explained that Odin helped him manage his PTSD, a disability under the ADA. After a phone call, the manager told him he could not donate. Matheis offered to leave Odin in his car and donate without him. The manager rejected this, stating he could not donate until he brought back a letter from his healthcare provider saying he could safely donate without Odin. Matheis left CSL and has not returned to donate plasma since.

CSL's concern is not related to any health concerns that dogs like Odin pose; rather it has concluded that using a service animal for anxiety means that the donor's condition is too severe to undergo safely the donation process.

Matheis filed suit alleging discrimination for a failure to accommodate his condition. To establish his claim, he must show that (1) he is disabled, (2) CSL is a "public accommodation" under Title III of the ADA, and (3) it unlawfully discriminated against him on the basis of his disability by (a) failing to make a reasonable modification that was (b) necessary to accommodate his disability. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001); *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 123 (3d Cir. 2018).

CSL does not dispute that Matheis is disabled or that Odin is a trained service animal. Thus this appeal hinges on the two issues noted above: whether the ADA applies to CSL; and, if so, whether its conduct was unlawful discrimination under the ADA. It moved for summary judgment contending that it was not subject to the ADA or, alternatively, that its policy—barring all individuals who use service animals for anxiety—was reasonable. *See* Defendant's Mot. for Summ. J.

6

at 12–19, *Matheis v. CSL Plasma, Inc.*, No. 1:17-cv-00785-SHR, 346 F. Supp. 3d 723, 734 (M.D. Pa. 2018) (ECF No. 27).

The District Court ruled that the ADA covered CSL, but that the company did not unlawfully discriminate because it had a legitimate, non-discriminatory reason for refusing to allow Matheis to donate plasma, a concern that he had severe anxiety. *Matheis v. CSL Plasma, Inc.*, 346 F. Supp. 3d 723, 734 (M.D. Pa. 2018). The Court buttressed what it recognized as a "necessary, yet counterintuitive," conclusion, *id.* at 735, by stressing CSL would let Matheis donate with Odin once he cleared it with a doctor. *Id.* at 737 ("CSL stated that it would admit Plaintiff if he provided it with a note from a psychologist stating that he could donate safely *with* Odin accompanying him.") (emphasis added). But CSL's stance is that Matheis may not donate until he can safely donate *without* Odin.

Matheis appeals the ruling, while CSL cross-appeals contending it is not subject to the ADA at all. The Plasma Protein Therapeutics Association also filed an *amicus* brief and participated in oral argument, arguing that Title III of the ADA does not apply to plasma donation centers like CSL.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction per 28 U.S.C. §§ 1331 and 1343(a)(4). Its grant of summary judgment was a final order, and so we have jurisdiction under 28 U.S.C. § 1291.

We review *de novo* a grant of summary judgment. *Metro Transp. Co. v. N. Star Reinsurance Co.,* 912 F.2d 672, 678 (3d Cir. 1990). We apply the same test the District Court would use. *Dwyer v. Cappell*, 762 F.3d 275, 279 (3d Cir. 2014). Under this test, reviewing the facts in the light most favorable to the non-mover, we grant summary judgment "if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. Discussion

### A. Does the ADA apply to plasma donation centers?

The ADA is divided into three titles of regulation—Title I (employers), Title II (governments), and Title III (public accommodations). Title III states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182. It reflects the ADA's "comprehensive character," *Martin*, 532 U.S. at 675 (quotation omitted), and defines "public accommodation" to include, in relevant part:

> a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, *or other service establishment*;
>
> . . . .

42 U.S.C. § 12181(7)(F) (emphasis added). Our focus narrows to whether a plasma donation facility is an "other service establishment."

This question has already produced a circuit split. In *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1229 (10th Cir. 2016), a divided panel held that plasma donation centers were subject to the ADA as service establishments.

8

The Court relied on a broad, common definition of "service" and "establishment"—"conduct or performance that assists or benefits someone or something" and a "place of business," respectively. *Id.* at 1231 (quoting *Webster's Third New International Dictionary* 778, 2075 (2002)). It reasoned that giving the term "service establishment" the ordinary meaning of its components yielded neither ambiguity nor an irrational result. Plasma donation centers "are 'place[s] of business.' . . . And they 'assist[] or benefit[]' those who wish to provide plasma for medical use—whether for altruistic reasons or for pecuniary gain—by supplying the trained personnel and medical equipment necessary to accomplish that goal." *Id.* at 1234 (same) (alterations supplied in opinion).

The Fifth Circuit in *Silguero v. CSL Plasma, Inc.*, 907 F.3d 323 (5th Cir. 2018), viewed things differently. It made two base observations—the donor is not benefited by donating, and each of the listed service establishments provides services to the public in exchange for money. These features did not apply to plasma donation services. *Id.* at 329.

The dissent in *Levorsen* took a similar line. It followed *ejusdem generis*, a canon of statutory interpretation that interprets a last, general term by looking to the preceding examples. From these the dissenting judge proposed the following definition: a service establishment "offer[s] the public a 'service' (1) in the form of (a) expertise (e.g., barbers, beauticians. . ., and hospitals) or (b) specialized equipment (e.g., laundromats and gas stations), (2) for use in achieving some desired end, (3) in exchange for monetary compensation." *Levorsen*, 828 F.3d at 1235 (Holmes, J., dissenting). He concluded that plasma donation centers could not qualify as service establishments because donors do not pay money for the service and (confusingly) because the donation centers do not offer their services in order to benefit the public.

9

> [T]o the extent that plasma-donation centers provide services to the public—such as those services identified by Mr. Levorsen and the United States—they do not do so for the *public's* use in achieving a desired end; instead, they provide them for the *centers'* use in achieving a desired end. More specifically, plasma-donation centers provide the public with the expertise associated with blood [extraction] . . . so that the centers can sell the plasma to their customers in the pharmaceutical industry (i.e., the desired end)—not so that they can assist the public to achieve some desired end.

*Id.* at 1243 (emphases in original).

We align with the majority in the Tenth Circuit. First, at least here no support exists for the Fifth Circuit's statement that donors "do not benefit" from the act of donating. The record is unequivocal that Matheis and other donors receive money, a clear benefit, to donate plasma.

Second, Judge Holmes's attempt in his dissent to distinguish this benefit on the basis of the secondary profit motive of plasma facilities is unpersuasive. A bank, one of the listed examples in § 12181(7)(F), is an obvious example of a service establishment that uses the fruits of its public-facing services for subsequent profit. Not only does it provide the means and expertise to hold safely the public's money, it also may provide interest or other benefits (including cash or rewards) to convince customers to entrust them with their savings. That a bank subsequently invests, trades, or loans this money to third parties does not make it any less a service establishment with respect to the public.

10

Moreover, any emphasis on the direction of monetary compensation is, to us, unhelpful. Businesses that offer services to the public convey something of economic value in return for something else of economic value. The value received by the service provider and given by the customer is often money, but it need not be. Money is one proxy for economic value, and economic value is fungible.

The bank example shows we should not arbitrarily narrow the scope of "service establishments" to entities that receive compensation from customers in the form of money. Banks and their customers exchange sources of economic value that do not always fit into a simple "money for service" model. As noted, customers often receive money from banks for using the bank's service. Banks are hardly the only example of companies that pay the public to use their services. A*micus* Plasma Protein Therapeutics Association conceded at oral argument that a pawnshop is a service establishment under Title III. It pays money in exchange for people's possessions. So too, as the District Court noted, is a recycling center a service establishment; it compensates consumers in exchange for their waste and has been held subject to the ADA. *Matheis*, 346 F. Supp. 3d at 734 n.9 (citing *Estrada v. S. St. Prop., LLC*, No. 17-cv-259, 2017 WL 3461290, *3 (C.D. Cal. Aug. 11, 2017)). These examples underscore a simple fact: providing services means providing something of economic value to the public; it does not matter whether it is paid for with money or something else of value.

Hence we conclude that a plasma donation center is a service establishment under the ADA. It offers a service to the public, the extracting of plasma for money, with the plasma then used by the center in its business of supplying a vital product to healthcare providers. That both the center and members of the public derive economic value from the center's provision and public's use of a commercial service does not

11

divorce the center from the other listed examples in § 12181(7)(F). Indeed this is an irreducible feature of a market system.

B. Did CSL discriminate against Matheis?

We next turn to whether CSL violated the ADA when it barred Matheis from donating plasma.

i.    Legal standard

The statute requires that public accommodations not discriminate on the basis of disability. Discrimination includes:

> a failure to make *reasonable* modifications in policies, practices, or procedures, when such modifications are *necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would *fundamentally alter the nature* of such goods, services, [etc.].

42 U.S.C. § 12182(b)(2)(A)(ii) (emphases added).

A company regulated under Title III may be held liable for failing to accommodate. This is "a standard that turn[s] on (1) whether the requested accommodation to the program was 'reasonable'; (2) whether it was necessary 'to assure meaningful access'; and (3) whether it would represent 'a fundamental alteration in the nature of [the] program.'" *Berardelli*, 900 F.3d at 115 (quoting *Alexander v. Choate*, 469 U.S. 287 (1985)). The plaintiff bears the initial burden of establishing that the desired accommodation is reasonable and necessary, while the defendant bears the burden

12

of showing that it would fundamentally alter the nature of the program.  *Id.* at 124; *see J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 671 (4th Cir. 2019).

CSL does not contend that permitting Odin to accompany Matheis would fundamentally alter the nature of its service.  Nor does it dispute Matheis's evidence showing that Odin is a necessary accommodation (indeed, CSL's policy assumes that Odin is a necessary accommodation and bars Matheis outright for it).  The only question is whether his use of Odin is reasonable.

Title III entities are required by regulation to "modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability."  28 C.F.R. § 36.302.  In other words, use of a service animal by a disabled individual "is reasonable under the ADA as a matter of law" so long as no Department of Justice-promulgated regulation supersedes this general rule.  *Berardelli*, 900 F.3d at 119 (vacating a jury verdict for a school district that denied one of its students with epilepsy use of her service dog).[2]  The service-animal regulations satisfy Matheis's initial burden to show an accommodation is reasonable; CSL must establish that an exception to those regulations applies.  *Id.* at 124.

This burden differs significantly from the test the District Court seems to have applied when it concluded CSL's denial was not based on a "discriminatory animus."  It borrowed the employment discrimination framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[2] Though *Berardelli* involved the reasonableness of service animals under the Title II regulations (Part 35), the approach here is identical, as those animal service regulations use "materially identical language" as the regulations under the Title III regulations (Part 36).  *Id.* at 118–19.

13

That framework involves burden shifting: a plaintiff must establish a *prima facie* case of discrimination; when he does, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action against the employee. If the employer does so, the employee may attempt to show the reason is a pretext to hide discrimination. *See, e.g.*, *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 668 (3d Cir. 1999).

Because a plaintiff need not show intentional discrimination to demonstrate a violation of Title III of the ADA, *Lentini v. Calif. Ctr. for the Arts, Escondido*, 370 F.3d 837, 846-47 (9th Cir. 2004), we reject using *McDonnell Douglas* in this context, and instead follow the *Berardelli* framework for ADA claims against a public accommodation. Thus we must determine whether CSL has established exceptions that permit a plasma donation center to deny a disabled individual's use of a service animal. If none apply, Matheis's use of Odin is a reasonable accommodation, and his claim succeeds.

ii.      Regulatory exceptions

In *Berardelli* we concluded that a small group of regulatory exceptions, both within the animal service regulations and listed elsewhere in Part 35, formed the exclusive bases for a government entity to deny a service animal who is a necessary accommodation for a disabled person:

> [The regulations] specify the limited circumstances in which it would be unreasonable to require these actors to allow the use of service animals: if granting access would . . . pose a "direct threat" to the health or safety of others, *id.* §§ 35.139, 36.208, or if the animal is

14

either "out of control" or "not housebroken,"[] *id.* §§ 35.136(b)(1)–(2), 36.302(c)(2)(i)–(ii) . . . . Subject to these exceptions, however, the regulations mandate that "[i]ndividuals with disabilities shall be permitted to be accompanied by their service animals in all areas of [a covered actor's facilities] where . . . program participants . . . are allowed to go." *Id.* § 36.302(c)(7); *see also id.* § 35.136(g).

*Id.* at 119.

As the citations to Part 36 indicate, identical regulations exist for Title III entities. None is relevant here. The closest fit is 28 C.F.R. § 36.208, which permits public accommodations to deny anyone who poses a "direct threat" to others. While CSL expresses concern that people like Matheis are a threat to staff and other donors, the "direct threat" exception requires "an individualized assessment" to determine "[t]he nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk," 28 C.F.R. § 36.208, an assessment CSL did not perform.

That is not all that is relevant, however. The parties and the District Court each note the eligibility regulation for Title III public accommodations, 28 U.S.C. § 36.301, and it ultimately controls our inquiry. It states that "[a] public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 U.S.C. § 36.301(b). The parties agree CSL's

15

policy deferring donors who use multiple anxiety medications or a service animal is a safety rule, so it must pass muster under § 36.301(b).

The parties and the District Court also note the blood transfusion regulation in 21 C.F.R. § 630.10, but this does not alleviate CSL's burden under § 36.301(b). It states a donor is ineligible if the donation "could adversely affect the health of th[at] donor," 21 C.F.R. § 630.10(a), but the facility "must determine the donor's eligibility" by the specified procedures for individualized assessment, 21 C.F.R. § 630.10(d). The individualized assessment must check for

> factors that make the donor ineligible to donate. . . . Your assessment must include each of the following factors:
>
>> (i) Symptoms of a recent or current illness;
>>
>> (ii) Certain medical treatments or medications;
>>
>> . . . .

21 C.F.R. § 630.10(e)(2). The regulation does not clarify which treatments are included among the "[c]ertain medical treatments."

CSL contends that it has complete discretion to determine what treatments, including use of service animals, show a donor may be harmed by donating. This overreads the blood transfusion regulation. It does not give plasma donation centers *carte blanche* to ignore U.S. law, which not only mandates that service animals be allowed, 28 C.F.R. § 36.302(c), but also specifies when public accommodations may adopt rules that exclude disabled individuals in the name of safety, 28 C.F.R. 36.301. Applied to our case, CSL may

16

consider a service animal among the list of "[c]ertain medical treatments" it can assess for eligible donating of plasma so long as it can show that the safety policy it adopts is based on "actual risk and not mere speculation, stereotypes, or generalizations about individuals with disabilities."

                iii.       Is CSL's policy a valid safety rule?

Though CSL bears the burden to show its service animal policy is valid under § 36.301(b), the evidence it marshals on its behalf is unimpressive and not remotely adequate to confer summary judgment. It relies exclusively on a declaration from Dr. John Nelson, its divisional medical director, stating that "[d]onors with severe anxiety may be unable to follow directions, cause disturbances, impact the donation process . . .[,] putting staff at risk of getting stuck with the needle and other donors at risk of getting blood on them." J.A. at 89. It also states that "[i]t is my professional medical opinion that donors with severe anxiety present serious health and safety risks to themselves, medical staff, and other donors." *Id.* at 90. The declaration's lone statement addressing the use of a service animal is that

> CSL's general policy is to defer a donor who requires more than two medications daily or a service animal for anxiety, until the need for medications or service animal decreases. . . . This policy is not directed to the use of a service dog, as CSL allows service dogs for vision-and hearing-impaired donors, but is based on the severity of the anxiety.

*Id.*

These statements don't get the job done. Indeed, they seem clearly speculative and to generalize widely about

17

individuals who use psychiatric service animals, all of whom CSL apparently views as people with "severe anxiety." No medical justification or other scientific evidence undergirds CSL's implicit conclusion that all those persons have "severe anxiety" and will put staff, other donors, or themselves at risk when donating plasma. This conclusion is not even stated; Dr. Nelson does not connect the dots by attesting that using a service animal indicates "severe anxiety." This is clearly inadequate to show that CSL's policy is based on actual risk and not based on speculation, stereotypes, or generalizations.

CSL's main retort is that Matheis cannot now challenge Dr. Nelson's declaration because he failed to challenge its reliability before the District Court under Federal Rule of Evidence 702. (CSL Br. at 31.) Though Matheis did not move to exclude the declaration, this is not fatal; he argued before the District Court that the testimony fails to satisfy the safety rule regulation. *See* Plaintiff's Br. in Opp'n to Def.'s Mot. for Summ. J. at 15–16, *Matheis*, No. 1:17-cv-00785-SHR, 346 F. Supp. 3d 723 (ECF No. 30). He can press this issue on appeal, as he does, without challenging Dr. Nelson's reliability as a witness. (*See* Matheis Br. at 19, Reply at 8–9.)

As a final Hail Mary, CSL argues it had other reasons for concluding Matheis had severe anxiety (which we assume for the sake of argument could support deferral for the reasons stated in the Nelson Declaration). Discovery revealed that Matheis had a panic attack after he was deferred from CSL (he confronted a homeless man while leaving the facility) and that some of his past panic attacks have been accompanied by violent symptoms. (*See generally* CSL Br. at 21–29.) It asserts that these facts show it reasonably required him to seek a doctor's signoff that he was safe to donate without Odin.

While we disagree, we note a predicate problem as well. CSL raises this issue for the first time on appeal. Before the

18

District Court it moved for summary judgment on two narrow grounds: (1) that CSL was not a public accommodation under Title III of the ADA; and (2) that its policy barring all anxiety patients who use a service animal to treat anxiety was a legitimate safety rule. *See* Defendant's Mot. for Summ. J. at 12–19, *Matheis*, No. 1:17-cv-00785-SHR, 346 F. Supp. 3d 723 (ECF No. 27). We will not consider its new argument in favor of summary judgment. *See Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) ("It is axiomatic that arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this Court absent exceptional circumstances.") (quotation omitted).[3] As CSL's two timely justifications for summary judgment fail, we reverse.

## IV. Conclusion

CSL is a public accommodation under Title III of the ADA, and so it applies to CSL's plasma donation center. Hence we affirm the District Court's ruling on this issue.

We reverse, however, its grant of summary judgment to CSL on whether it complied with the ADA. In doing so, we do not suggest that CSL would be wrong in the future to require a doctor's note stating Matheis may safely donate with Odin. Indeed, had CSL adopted such a stance from the start, we might agree with how the District Court ruled. But CSL concedes that it will only consider Matheis as a potential donor when he provides a doctor's note attesting he can safely donate *without* Odin. CSL's lone justification is its service animal policy, which it does not support with evidence showing that policy is

---

[3] To the extent CSL has attempted to justify Matheis's deferral by pointing to his post-deferral panic attack that he experienced while leaving the donation facility, we do not see how an event that occurred after deferral could now be cited as a basis for it.

based on actual risk and not speculation, generalizations, or stereotypes.  Moreover, CSL fails to explain why Matheis, who has managed his PTSD for nearly two decades and safely donated plasma roughly 90 times, should only be considered safe to donate when he renounces the new service animal that helps him *better* manage his PTSD.

Thus we reverse and remand the District Court's grant of summary judgment in favor of CSL.  On remand, the Court may determine whether to permit CSL to move for summary judgment on other grounds, to hold trial, or to conclude on the facts presented that CSL violated the ADA.