NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1753
_____

JULIE ELLEN WARTLUFT, f/k/a Julie Ellen Bartels;
FREDERICK L. BARTELS, JR., Individually and as Administrators of
the Estate of Abrielle Kira Bartels, Deceased,
Appellants

v.

THE MILTON HERSHEY SCHOOL AND SCHOOL TRUST;
THE HERSHEY TRUST COMPANY, as Trustee of the
Milton Hershey School Trust
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:16-cv-02145)
District Judge: Honorable John E. Jones, III
_____

Argued: November 16, 2020

Before: AMBRO, BIBAS, and ROTH, *Circuit Judges*

(Filed: February 1, 2021)
_____

Gregory F. Cirillo                    [ARGUED]
John J. Higson
John W. Schmehl
Dilworth Paxson
1500 Market Street
Suite 3500E
Philadelphia, PA 19103

    *Counsel for Appellants*

Kyle M. Elliott
Elliott Greenleaf
925 Harvest Drive
Suite 300
Blue Bell, PA 19422

Jarad W. Handelman                    [ARGUED]
Elliott Greenleaf
17 North Second Street
Suite 1420
Harrisburg, PA 17101

    *Counsel for Appellees*

_____

OPINION*

_____

BIBAS, *Circuit Judge*.

A death by suicide is tragic. But not every tragedy leads to legal liability. Soon after Abrielle Bartels came home from boarding school, she took her own life. Her parents sued the School. But the care the School offers is limited. It is not a licensed mental-health or residential-treatment center. Nor do its psychologists have admitting privileges at any in-patient psychiatric hospital. Instead, the School leaves high-level care to outside experts. So we will affirm the District Court's grant of summary judgment for the School.

## I. BACKGROUND

The Milton Hershey School is a private, nonprofit boarding school for poor children. It is completely free. And it covers all its students' needs: room, board, clothing, supplies, medical care, even an allowance.

---

* This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

From kindergarten on, Abrielle Kira Bartels (known as Abbie) was a good, well-liked student at the School. But beginning in sixth grade, she started becoming anxious and depressed, struggled with suicidal thoughts, and, in seventh grade, even tried to suffocate herself. For a while, she told no one. But late in eighth grade, in April 2013, she began confiding in Dr. Herr, a School psychologist.

When she did, the School jumped into action. It started with therapy. In the month of May, Dr. Herr met with Abbie six times so he could gauge her mood and treat her. But those efforts failed. Abbie's condition worsened. She developed suicidal thoughts. The School decided that weekly therapy was not enough, so it moved Abbie into the Health Center for observation.

Even that was not enough. Less than a week later, Abbie reported that she had been thinking of ways to kill herself, but just lacked the means. The School decided that she needed intensive care. Because it is not a licensed mental-health treatment center, it sent her to an inpatient hospital, Philhaven.

Dr. Herr and Abbie's mother checked her into Philhaven on May 28. She stayed there for just over a week. Though Dr. Herr visited sometimes, Abbie stayed in the hospital's sole care. But once the hospital decided that she posed no risk of hurting herself, it discharged her back to the School on June 5.

Her return to school was brief. Two days in, she told a classmate that she had scissors in her pocket and wanted to hurt herself. She rated her desire to die as a 9 on a scale of 1 to 10. And she reported that her reasons to live no longer meant anything to her. So the School put her in the Health Center again. But she grew worse. She repeated that she

wanted to die but lacked the means. The School's doctors consulted and agreed that Abbie needed to go back to a hospital. They put her on round-the-clock observation and settled on the Pennsylvania Psychiatric Institute.

Dr. Herr and Abbie's mother checked Abbie into the Institute on June 11. While she was there, school officials discussed whether she could return to the School. Though it seemed unlikely, they had not yet made an official decision and planned to discuss that over the summer break, ten days away. The prospect of not returning to School upset Abbie.

The Institute discharged Abbie to her parents' care on June 19, two days before she was supposed to graduate from eighth grade. But the Institute did not notify the School of Abbie's discharge. The School learned of it only when Dr. Herr called Abbie's mother to ask about visiting the hospital.

Before Abbie's discharge, however, the School had made clear to her mother that she could not attend her upcoming eighth-grade graduation or the barbecue at her student house. The School had decided that it could not support the level of care that Abbie needed right then. Though that was disappointing, her father's girlfriend reported that Abbie seemed to understand the decision.

Tragically, Abbie then took her own life at home. It was ten days after her discharge, and just over a week after graduation.

Abbie's parents sued the School both on their own behalf and as representatives of Abbie's estate. They claimed violations of the Fair Housing Act, negligence, and intentional infliction of emotional distress. They also invoked Pennsylvania's Wrongful Death

4

and Survival Act. The District Court granted summary judgment for the School on all counts. Abbie's parents appeal. We review de novo. *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 176 (3d Cir. 2019).

## II. THE SCHOOL DID NOT VIOLATE THE FAIR HOUSING ACT

Abbie's parents claim that the School violated the Fair Housing Act by barring Abbie from her eighth-grade graduation and disinviting her from her house's graduation barbecue based on her mental illness. They raise these claims under two paragraphs of the Act: 42 U.S.C. §3604(f)(1) and (f)(2). Each claim fails.

### A. Because Abbie was not a renter under the Act, §3604(f)(1) does not apply

Section 3604(f)(1) is the heart of the Act. It forbids "mak[ing] unavailable or deny[ing], a dwelling to any buyer or renter because of a handicap of—(A) that buyer or renter." " 'To rent' includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant." *Id.* §3602(e). This claim turns on whether Abbie "rente[d]" her housing from the School. Both parties agree that she did not formally lease or sublease it. But her parents argue that the chores she had to do around the student house counted as consideration.

They did not. Consideration is "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something." *Consideration*, *Black's Law Dictionary* (11th ed. 2019). Consideration need not be in cash. For instance, if a landlord gives a building's superintendent an apartment in exchange for managing and maintaining the apartment building, the Act would cover that quid pro quo. *Dixon v. The Hallmark Cos.*, 627 F.3d 849, 858 (11th Cir.

2010). But in that example, the landlord provides the apartment *because* the superintendent agreed to work. The housing is a bargained-for payment for a job. *Id.*

Here, by contrast, Abbie provided no consideration for her housing. Though the School made her do chores, the chores did not help Abbie get housing and were not part of a bargain. Instead, the chores were more like homework: a core part of her educational experience to prepare her for life after school. Indeed, as the School's counsel explained at oral argument, if a student could not physically perform chores, the School would not deny her education or housing. The School housed Abbie out of charity. That free student-housing model falls outside the Act.

### B. Because the graduation ceremony was not a service related to Abbie's housing, §3604(f)(2) does not apply

Abbie's parents next focus on §3604(f)(2), which bans discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling." The parents first claim the School violated the ban by denying Abbie access to her graduation ceremony. We disagree.

A graduation ceremony is not a term, condition, or privilege of *renting*. Though it is perhaps a service, it is not offered "in connection with" housing, as required by paragraph (f)(2). The School offered the graduation ceremony not as a housing benefit, but as part of the School experience. Day schools have graduations too.

### C. Because the parents' §3604(f)(2) claim for the barbecue repackages their §3604(f)(1) claim, it also fails

The parents' second §3604(f)(2) claim, about the house barbecue, is closer to the mark. Unlike the graduation ceremony, the barbecue arguably happened in connection with

Abbie's dwelling. And because paragraph (f)(2) is broader than (f)(1), covering "any person" and not just a "buyer or renter," it does not matter whether she gave consideration. Yet this claim still fails because it just repackages their failed (f)(1) claim.

The School disinvited Abbie from the barbecue. The barbecue was for its student residents, and Abbie was no longer attending classes. So the School's ban on Abbie attending house activities was incidental to its denying her housing. But paragraph (f)(2) does not cover discrimination incidental to the complete denial of housing. That discrimination is covered by paragraph (f)(1), which focuses on *access* to a dwelling. By contrast, (f)(2) focuses on services and facilities offered *in connection with* a dwelling once a person has access to that dwelling. They are not inherently tied to who uses them. *See, e.g.*, *Astralis Condominium Ass'n v. Sec'y, U.S. Dep't. of Hous. & Urb. Dev.*, 620 F.3d 62, 67–68 (1st Cir. 2010). A tenant's disabled guest, for example, could sue the landlord for denying her services or facilities she needs to visit her friend.

If (f)(2) did cover discrimination incidental to the complete denial of housing, it would swallow up (f)(1) and its limitations. Technically, one "facilit[y] in connection with [a] dwelling" is the housing space itself, so any denial of housing covered by (f)(1) would also violate (f)(2). But that would read (f)(1)'s limit of its coverage to "buyer[s] or renter[s]" out of the statute. And as the District Court correctly noted, we avoid reading one part of a statute to render other parts meaningless. *Rep. of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019). So the Act does not apply. Summary judgment was proper.

### III. THE SCHOOL DID NOT OWE ABBIE A DUTY OF CARE
### AFTER SHE WAS ADMITTED TO THE INSTITUTE OR OVER THE SUMMER BREAK

The District Court properly held that the School was not negligent because it owed her no duty of care after she was admitted to the Institute. When she died over the summer break, she was in her parents' custody, not the School's.

#### A. The School's *in loco parentis* duty ended when Abbie was admitted to the Institute

To be liable for negligence, a defendant must owe the plaintiff a duty and breach that duty. Abbie's parents claim that the School owed Abbie a duty because it stood *in loco parentis*: in the place of a parent. But while that was true at School, it was not once Abbie left. That duty typically depends on physical custody of a child. *See* Restatement (Second) of Torts § 314A (1965). Once the child is out of a school's control, the school no longer stands in the shoes of the parents. *Watson v. PennDOT*, 1996 WL 942124, at *5 (Pa. Ct. Cmn. Pl. Mont. Cnty. 1996). When a student returns to her parents, it is typically the parents who are responsible for her, not the school.

Once Abbie's mother checked her into the Institute, the School's duty *in loco parentis* ended. The Institute discharged Abbie to her mother, not to the School. It did not even notify the School. In any event, the duty could not extend over the summer break, when Abbie was back with her parents full-time.

#### B. Abbie's parents did not timely claim a continuing duty of care

Seeking to escape this lack of duty, Abbie's parents claimed for the first time at summary judgment that the School owed Abbie a "continuing duty" of care even after it released her to the Institute. But the District Court properly refused to consider that belated

claim because it did not appear in their complaint. Not once does the complaint use the phrase "continuing duty of care." Nor did the parents ever allege it before their summary-judgment briefs, even though they discussed the duty *in loco parentis* at length.

## IV. THE OTHER CLAIMS FAIL TOO

### A. There is no evidence that the School intentionally inflicted emotional distress

Intentional infliction of emotional distress is very hard to prove. And as the District Court rightly found, Abbie's parents have not proven it.

Pennsylvania reserves this tort for the worst conduct imaginable. "[T]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. 1987)). No such conduct happened here. On the contrary, the School acted reasonably: it put Abbie in the care of licensed mental-health professionals. None of its actions was reprehensible. There is nothing intolerable about making sure a suicidal student gets professional treatment before returning to campus.

### B. Because the state-law tort claims fail, there is no cause of action under the Wrongful Death and Survival Act

Pennsylvania's Wrongful Death and Survival Act is just a way for plaintiffs to recover for unlawful conduct that results in death. It does not create a standalone cause of action. Rather, it ensures that if the decedent had a personal cause of action but did not bring it while alive, that right survives for her heirs or estate. *See Carroll v. Skloff*, 202 A.2d 9, 10–

9

11 (Pa. 1964), *overruled on other grounds by Amadio v. Levin*, 501 A.2d 1085, 1089 (Pa. 1985). Because the other claims fail, the Wrongful Death and Survival Act claim fails too.

\* \* \* \* \*

Abbie Bartels's passing was a tragic loss. But in the weeks and days before her death, the Milton Hershey School owed her no duty to do more. We will affirm.